McAndrew *v.* Scranton Republican Publishing Company, Appellant.

Argued January 16, 1950. Before MAXEY, C. J., DREW, LINN, STERN, STEARNE and JONES, JJ.

*Eugene Nogi,* with him *J. Julius Levy, James E. O'Brien* and *Nogi, O'Malley & Harris,* for appellant.

*John R. Gaughan,* with him *Victor J. Roberts,* for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY:

This is an appeal from the judgment of the Superior Court affirming the judgment of the Court of Common Pleas of Lackawanna County, denying defendant's motion for judgment n. o. v. The plaintiff brought an action of trespass for libel as a result of an article published by the defendant in its newspaper during a political campaign in Lackawanna County in 1946, reporting a political meeting which occurred in Mayfield Borough, Lackawanna County, on a certain Sunday afternoon. At that meeting Captain Fraser P. Donlan, who was Republican nominee for State Senator, made an address. He appeared in uniform, as he was still an officer. During the recent war he had his leg shot off while serving with the Marine Corps in action at Okinawa.

The article alleged that Matthew McAndrew took the platform and declared that the wounded Marine officer was trying to get sympathy votes by "carrying the flag". The article also said that McAndrew in replying to G. O. P. charges that "Communism found a home in the Democratic Party" apologized by saying: "Of course,

we all have to have a little Communism today." The entire publication is set forth below.[1]

Following this newspaper article action was brought against the appellant for libel. During the trial the appellant duly moved for a compulsory nonsuit and subsequently moved in writing for a directed verdict in its favor, both of which motions were denied. The case was submitted to the jury and a verdict in favor of the appellee in the sum of $900.00 was returned. Judgment was duly entered on the verdict. The jury also answered certain interrogatories. Defendant filed its motion for judgment n. o. v., which was denied. On appeal the Superior Court affirmed the judgment. An appeal to this court was then allowed.

The pivotal questions in this case are: 1. Was the publication complained of capable of a defamatory meaning? 2. When the trial court concluded that the publication in question was on a privileged occasion and made from a proper motive and in a proper manner, and when the plaintiff offered no evidence of the abuse of a privi-

---

[1] "CAPT. DONLAN ROUTS HECKLERS WHO ACCUSE HIM OF TRYING TO GET SYMPATHY VOTES

Three Court House employes threw a political meeting in Polish Hall, Mayfield, into wild confusion yesterday afternoon and were promptly denounced from the floor when their spokesman charged Capt. Fraser P. Donlan, Republican nominee for State Senator, was using his uniform and the flag to get sympathy votes.

Reflecting the panic that Capt. Donlan's candidacy has created in the Democratic leadership, Matthew McAndrew, Chief Deputy in the County Treasurer's Office, and an Archbald politician for many years, took the platform and declared that the wounded Marine officer was trying to get sympathy votes with his uniform and by carrying the flag.

JUST A LITTLE COMMUNISM

McAndrew, in the course of his blistering attack on the Republican candidates, took occasion to reply to G O P charges that Communism found a home in the Democratic Party. He apologized by saying 'of course, we all have to have a little Communism today.' "

leged occasion, should not the court have directed a verdict for the defendant?

At the trial Thomas F. Phillips, City Editor of the defendant Company, testified as to the origin of the publication of the article. Attorney Harold A. Scragg reported the matter to him and told him that Joseph Marzzacco, Esq., and James Scoblick, Republican candidate for Congress, both of whom were also present at the Mayfield meeting, would report the facts to Mr. Phillips. The latter then called Mr. Marzzacco, who replied: "I was there and I will give it to you exactly how it happened," and Mr. Phillips took down the story. He "read it back" to him and had it confirmed. In the meantime Mr. Phillips received a telephone call from James Scoblick, to whom Phillips then read the story, and Scoblick replied: "That's precisely what happened." Mr. Phillips added: "On the basis of that information I phoned the story in to the office and sent word to the man who was working the city desk that I had checked the story out."

In his opinion refusing judgment n. o. v. in this case President Judge Hoban said: "The published words in this case are actionable provided they are in fact defamatory and are published in such a manner as to constitute a libel. A communication is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." He then said: ". . . the question arises as to whether the printed report of McAndrew's actions or sayings at the political meeting would tend to lower him in the estimation of the community in which he lives, or to deter persons from associating or dealing with him." He also said: ". . . initially it is the function of the Court to determine whether the communication is capable of a defamatory meaning, and if the Court finds that such a meaning is not capable of being derived from the communication, the judge would have to grant a nonsuit, give binding

instructions or judgment n. o. v. as appropriate." He then said: "The trial judge decided that such a [defamatory] meaning could be derived from the publication and that it was his duty to submit the question, as to whether such a meaning actually was derived by the recipients, to the jury." Judge HOBAN then said: "The writer of this opinion, if he were one of the original recipients, would probably not have taken a defamatory meaning from it, but he can see how easily sentimental people at the time and place would have received the remarks and imputations attributed in the article to McAndrew. . . . So also with that part of the communication which attributes to McAndrew a statement that we all have to have a little Communism. Such a statement as indicating association or sympathy with a group or political organization which a substantial part of our citizens regard as a discreditable one, is capable of a defamatory meaning."

As to the defendant's allegation that no special damages were either alleged or proved, Judge HOBAN said: "For our purposes we may say that publication by a newspaper of general and wide circulation of defamatory matter is libelous. . . . One who falsely and without a privilege to do so publishes matter defamatory to another in such a manner as to make the publication a libel is liable to the other, although no special harm or loss of reputation results therefrom. . . . In other words, if the publication of defamatory matter is done in such a way as to constitute libel, it is actionable per se without either the allegation or proof of special damages, unless excused by the defense of truth or privilege, and as to these defenses the burden is clearly upon the defendant to prove." Judge HOBAN then said: ". . . the trial judge correctly considered that the occasion for the publication, to wit, the report of a political meeting of interest to the public, was a privileged occasion and that the publication was made from a proper motive and in

a proper manner. The only question which the trial judge considered should be submitted to the jury was whether or not the defendant had reasonable and probable cause to believe in its truth."

The court was in error in saying to the jury: "The question for you to determine is whether at that time and under the circumstances, the publication of the fact that McAndrew is supposed to have said that Donlan, a Marine officer, was trying to get sympathy votes by wearing his uniform and using the flag, was actually harmful to McAndrew?'' Before so instructing the jury, the court had determined that the communication *was capable of a defamatory meaning.* This determination is subject to review on appeal. Statements cannot be adjudged defamatory merely because they are annoying and embarrassing to the person to whom they are attributed. We have never found in any law report a case of a libel suit being successfully maintained against any person because of the latter's erroneous report that another person said that a candidate for public office was seeking the election on the basis of his military exploits, though such comments in a campaign are not unusual.

A might falsely report that B, a member of political party X, had declared that in the forthcoming election he was going to vote for the candidates of party Y. This report might be very annoying and embarrassing to B but he would not be defamed by it. Not every lie is a libel. A might falsely report that B had said that C was seeking votes because of his race or had said that D, who happened to be a fine tenor singer, was trying to "sing his way" into public office. While such reports might be very annoying and embarrassing to B, they would not justify an action for libel against A. Many men in public life and in private life have been greatly annoyed by being misquoted. But annoyance does not constitute defamation.

It would doubtless be very annoying for a man to be charged with bigotry of any kind, yet it has been held that for a man to be charged with such bigotry is not defamation. In *Sweeney v. Beacon Journal Pub. Co.*, 66 Ohio App. 475, 35 N. E. (2d) 471, a member of the United States Congress brought an action of libel against a newspaper which published a daily syndicated column stating that the congressman was opposing the appointment of a certain individual to a federal judgeship, because that individual was a foreign-born Jew. In overruling plaintiff's appeal from judgment against him on a question of law, the appellate court said: "Does the article reflect upon his character in such a manner as to bring him into ridicule, hatred or contempt?" This question was answered in the negative. And in *Sweeney v. Philadelphia Record Company* (CCA, 3d Cir.), 126 Fed. (2d) 53, where there was a similar action based on the same syndicated article, the Circuit Court of Appeals held that the publication "at the most charged [the congressman] with being a bigoted person" who was actuated by a prejudice of an unpleasant and undesirable kind but it was not libelous per se and the action could not be sustained.

Plaintiff in his statement of claim avers that the statement that Donlan "was trying to get sympathy votes with his uniform and carrying the flag" was equivalent to saying that he was charging Donlan with "trying to capitalize upon and get political support by the improper use of his service uniform, and by appealing to the sympathy of persons by an improper use of the United States flag, rather than by reason of his competency for the office to which he as candidate was aspiring, . . ."

It is elementary that " 'An innuendo, however, can never add to nor change the [alleged] meaning of the defamatory statement, or operate as an averment, imparting into the statement anything which is not a

usual and natural presumption from the precedent words.' " Quoted in *Liacopoulos v. Coumoulis,* 298 Pa. 329, 148 A. 474, from *Cunningham v. Underwood,* 53 C. C. A. 99, 116 Fed. 803. See also cases therein cited. While it is a question of fact for the jury as to whether the defamatory statement was used and understood in the *sense charged,* the jury cannot be permitted to do this until the court has correctly determined that the statement supports the meaning plaintiff attributes to it.

In *Sarkees v. Warner-West Corporation,* 349 Pa. 365, 37 A. 2d 544, this Court in an opinion by Justice HUGHES said: "The innuendo must be warranted, justified and supported by the publication. . . . 'But it cannot be used to introduce new matter, or to enlarge the natural meaning of the words, and thereby give to the language a construction which it will not bear: Hackett v. Providence Telegram Publishing Co., 18 R. I. 589. It is the duty of the court in all cases to determine whether the language used in the objectionable article could fairly and reasonably be construed to have the meaning imputed in the innuendo. If the words are not susceptible of the meaning ascribed to them by the plaintiff and do not sustain the innuendo, the case should not be sent to a jury.' See Ringer v. Winner, 309 Pa. 270, 163 A. 519."

Even if the statement is given the meaning which the plaintiff attributes to it, it is not defamatory. If Captain Donlan, who was a war casualty with a splendid record of service, was seeking votes because of that record, his doing so was neither unusual nor improper. Throughout all our history, many men who have achieved distinction in war, have sought the suffrages of their fellow citizens solely because of their war record. At least two military chieftains, Taylor and Grant, were named by their respective parties as candidates for president of the United States because of their war records. If A had reported that B had said that either one of these candidates was "trying to get sympathy

votes with his uniform and by carrying the flag," B would not have any ground for an action of defamation against A, nor would either of these candidates. Many of us can think of cases where men who have been blinded or disfigured by war, have been elected to office because of that fact and it would not be defamatory for anyone to declare that another had said, that these candidates were seeking "sympathy votes." Nor is there any justification for the innuendo alleging that the statement attributed to McAndrew meant that McAndrew said that Donlan was making an improper use of the United States flag. The phrase "using his uniform and the flag" was very much like the oft-used phrase "waving the flag." It does not imply that there is any desecration of the flag.

When men with military records become candidates for political office and they or their partisans unduly emphasize their military records or if the candidates appear or are advertised in uniform, there is sometimes adverse comment on the "bad taste" involved but such adverse comment is not defamatory.

Nor was the statement attributed to McAndrew to the effect that "we all have to have a little communism today" libelous. For one to favor a "little communism" does not mean that he favors the overthrow of our government by force or that he endorses any other illegal, immoral or unpatriotic program.[2] On October 28, 1946 when the alleged libel was published, the relations between the United States and Russia were very friendly and the public mind had not then identified communism

---

[2] Webster's New International Dictionary defines Communism as: "(1) A system of social organization in which goods are held in common;—the opposite of the system of private property. (2)—Communalism, 1. (3) Any theory or system of social organization involving common ownership of the agents of production, and some approach to equal distribution of the products of industry. The popular use of the word communism conforms to the third of these definitions."

with Russian imperialism and terrorism. To say a man is a communist or a socialist is not to defame him. There is no fundamental difference between these isms.[3] Their objectives are the same. The man who was six times the Socialist candidate for President of the United States, was recently honored by a testimonial dinner in New York, attended by eminent leaders of both major parties. The Communist party and the Socialist party have had legal recognition in this country and in several campaigns they have nominated candidates for the presidency and these candidates have received many votes.[4] The platforms of neither of these parties advocate anything unlawful. The Communist party claims that it is the only bona fide Socialist party.[5]

---

[3] The Encyclopaedia Britannica, Vol. 6 (14th ed.) p. 134 defines communism as: "almost synonymous with Socialism. . . . [The communists] advocate a form of production which is in the hands of the community; . . ." In John T. Flynn's book, "The Road Ahead," he states at p. 10: "Most of the countries in Europe have moved into the Socialist camp. The two which concern us most are Russia and Great Britain. Each has moved into socialism by a different route. Each has organized its Socialist society upon a different model. But both are Socialist."

[4] In 1932 the Socialist candidate for President received 884,781 votes. In 1936 the Communist candidate for President received 80,160 votes.

[5] The Communist Platform of 1948 states: "There is only one Marxist party in America, one party dedciated to replacing the capitalist system with Socialism—and that is the Communist party. . . . We Communists are dedicated to the proposition that the great American dream of life, liberty and the pursuit of happiness will be realized only under socialism, a system of society in which the major means of production will be collectively owned and operated under a government based on the working class. Only such a society can forever banish war, poverty and race hatred. Only in such a society can there be the full realization of the dignity of man and the full development of the individual. Only such a society can permanently protect the integrity of the home and family. Only a Socialist society can realize in life the vision of the brotherhood of man."

McAndrew was no more libeled by having attributed to him the remark that "we all have to have a little communism today" than he would have been if he had been reported as saying, "we all have to have a little prohibition today." There are probably some communities where prohibition is even more unpopular than communism. In view of the fact that the alleged defamatory statements were not libelous, the defendant was entitled to binding instructions.

There is another reason why the defendant was entitled to binding instructions. This Court in *Montgomery v. Dennison*, 363 Pa. 255, 69 A. 2d 520, upheld the view expressed in Volume III of the Restatement of Torts, Section 613 (2) as follows: "(2) In an action for defamation the defendant has the burden of proving, when the issue is properly raised, (a) the truth of the defamatory communication, (b) the privileged character of the occasion on which it was published, (c) the character of the subject matter of defamatory comment as of public concern." This means that if the defendant relies upon any *one* of these three defenses he must prove that defense. In the same opinion we quoted Comment f of the Restatement, Section 613, reading as follows: ". . . If he [the defendant] relies upon the defense that the communication was published upon a conditionally privileged occasion, he likewise has the burden of proving it. If he sustains this burden by evidence of the requisite quantity and quality, he will prevail unless the plaintiff takes up and sustains the burden of proving that the occasion was abused. The occasion may be abused because of the publisher's lack of belief or reasonable grounds for belief in the truth of the defamatory matter; because the defamatory matter was published for some purpose other than that for which the particular privilege is given; because the publication was made to some person not reasonably believed to be necessary for the

accomplishment of the purpose of the particular privilege; or because the publication included defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the privilege is given."

Prosser on Torts, p. 851, cited many English and American cases in support of the proposition that "The burden is upon the defendant in the first instance to establish the existence of a privileged occasion. . . . Once the existence of the privilege is established, the burden is upon the plaintiff to prove that it has been abused by excessive publication, by use of the occasion for an improper purpose, or by lack of belief or grounds for belief in the truth of what is said." [6]

The court below in its opinion filed in this case stated: ". . . the trial judge correctly considered that the occasion for the publication, to wit, the report of a political meeting of interest to the public, was a privileged occasion and that the publication was made from a proper motive and in a proper manner." Such being the fact, the burden then passed to the plaintiff to prove that the privilege had been abused and since the plaintiff had failed to sustain that burden, the court should have directed a verdict in favor of the defendant.

There was neither pleading nor proof by the plaintiff of any publication which in law amounted to defamation of him.

---

[6] In an article entitled "Privileged Defamation," 22 Virginia Law Review, p. 642, it is stated: "The question whether the occasion is privileged is one for the judge and not for the jury and on this issue the burden of proof is upon the defendant. Once the occasion is ruled by the judge to be privileged, the question whether it was abused by the defendant is one for the jury, subject only to the usual censorial power of the judge and the burden on the issue is upon the plaintiff." See Wright v. Woodgate (1835) 2 C. M. & R. 573; Clark v. Molyneux (1877) 3 Q. B. 237; Doane v. Grew (1915) 220 Mass. 171, 107 N. E. 620; Hebditch v. MacIlwaine (1894) 2 Q. B. 54, per Lord Esher; Stace v. Griffith (1869) L. R. 2 P. C. 420.

The judgment of the Superior Court is reversed and is here entered for the defendant n. o. v.

PER CURIAM, April 18, 1950: The foregoing opinion was prepared by the late Chief Justice MAXEY before his death on March 20, 1950. It is now adopted and filed as the opinion of the Court.

---

DISSENTING OPINION BY MR. JUSTICE JONES:

I would affirm on the unanimous opinion of the Superior Court (six members sitting) affirming the judgment of the court below. The record leaves no doubt that the case was fairly tried and submitted to the jury in a clear, impartial and thorough charge on both the facts and the law.

That the publication was legally capable of defaming McAndrew, the alleged utterer, seems to me to be patent. The learned trial judge justifiably found its "factual meaning" to be "quite clear". As aptly stated in the opinion for the court en banc,—"No one can take any other meaning than the story intends to convey: the information that Mr. McAndrew, this plaintiff here, said in effect that Captain Donlan, then a recently returned [wounded] officer of the United States Marine Corps [of which service he was still a member], and in this county a candidate for state senator was trying to get *sympathy* votes with his uniform and by carrying the flag" (Emphasis supplied). If McAndrew had actually so spoken of Captain Donlan, who had lost a leg due to wounds received in combat, he (McAndrew) would have merited, and have rightly received, the contempt and scorn of his community. Yet, he was unjustly made to suffer no less by the defendant's false ascription of the communication to him. The argument that the publication did not defame Captain Donlan is nothing more than a diverting irrelevancy; and treatment with it on that basis, so far as its possible efficacy as defamation

518

is concerned, serves only to obfuscate the real issue. One necessarily fails to defame a veteran by attempting to cast aspersions on his use of his honorable war record or resultant physical disability for political purposes. Such services and sacrifices, like the locale of their offering, are "consecrated . . . far above [anyone's] poor power to add or detract." But, the charge *is* defamatory, nonetheless, of *the alleged orator* because of the baseness so imputed to him which subjects him to shame and scorn.

In *Switzer v. Anthony,* 206 P. 391, 392, 71 Colo. 291, Mr. Justice DENISON, of the Supreme Court of Colorado, observed that ". . . if the article [there in issue] be considered as a statement that the plaintiff called the American flag a dirty rag, it is, we think, libelous per se, because, if believed, it was certain to bring upon the plaintiff the contempt and hatred of the community in which she lived, . . ." See also *Wells v. Times Printing Co.,* 137 P. 457, 77 Wash. 171, where it was said that language of similar character requires no innuendo to construe its meaning as intended to bring the person to whom its authorship is attributed into public hatred, contempt and ridicule and to expose him to public scorn and shame. Here, the baseness attributed to McAndrew by the publication lay in the assertion that he had charged a *wounded* veteran with seeking *sympathy* votes for his political benefit. The tendency of the communication was so to harm McAndrew's reputation as to lower him in the estimation of the community and to deter third persons from associating or dealing with him. That was defamatory (Restatement, Torts, §559), and printed or other relatively permanent defamation is libel or libel *per se* as it is sometimes redundantly denominated.

It is, of course, true that the capacity of the communication to defame presented, in the first instance, a question of law for the court. But, the solution of that

question rightly depended upon the inferences justifiably to be drawn in the circumstances with respect to the possible effect of the publication on its recipients. Manifestly, therefore, the matter is largely a factual one. And, up until now, nine judges, all learned in the law (three in the lower court and six in the Superior Court), have *unanimously* approved the learned trial judge's ruling that the publication in issue *was* legally capable of defaming the plaintiff.

The further statement attributed to McAndrew that "Of course, we all have to have a little Communism today" was unquestionably defamatory. As has been widely held, the meaning of such a remark is that the orator is a Communist or a Communist sympathizer. And, for the past twenty-five years in this country such a charge has generally been held to be defamatory. Of the more recent cases, see *Mencher v. Chesley,* 75 N. E. 2d 257, 259, 297 N. Y. 94 (Ct. App. N. Y.—1947); *Grant v. Reader's Digest Ass'n., Inc.,* 151 F. 2d 733, 735 (C. C. A. 2); *Spanel v. Pegler,* 160 F. 2d 619, 621 (C. C. A. 7) and cases there cited. Even the word "Red", applied by a newspaper to a particular individual, was held to be defamatory as being reasonably understood to mean a person believing in disobedience to law and in favor of the appropriation by force and sabotage of the property of others: *Toomey v. Jones,* 254 P. 736, 124 Okla. 167; see also Annotation 51 A.L.R. p. 1071 et seq.

The majority opinion seeks narrowly to dissipate the defamatory character of the Communist imputation by limiting the meaning of that term to people supporting the Russian government with which country this Nation had lately been an ally wherefore the term carried no publicly stigmatizing connotation. No such restricted sense of the term "Communist" has come to my attention from any other jurisdiction in this country. On the contrary, in *Mencher v. Chesley,* supra, the Court of Appeals of New York, in treating in 1947 with a 1944

publication charging one with being a Communist, said that,—"Today and in the recent past—whether or not communism stands for violent overthrow of government . . . it is undeniable that for communism and its adherents and sympathizers, there has been wide spread public aversion. Evidence of that antipathy is found not only in public opinion polls and in other studies . . . but also in legislation and executive orders enacted and promulgated during the past several years [prior to 1947] which subject communists and their affiliates and sympathizers to loss of public office and private position and, in some cases, even to deportation proceedings [citing authorities]." It was there also said that "it is no answer [to a charge of libeling another by calling him a Communist] that communists may function as a recognized political party." See Democracy and Defamation, 42 Col. Law Rev. 1282, 1304 (1942). In *Spanel v. Pegler*, supra, the charge of Communism there complained of was made in March of 1945 when we were actually (and not merely lately) an ally of Russia and the publication was nonetheless held to be defamatory. Nor is the meaning of the term "Communism", as employed in the subject communication, to be interpreted according to the technical definition of a dictionary or encyclopedia. "The meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express": Restatement, Torts, §563.

The so-called *Sweeney* cases which the majority opinion cites are not authority here, or elsewhere for that matter. The same published communication in issue in those cases was held by the Circuit Court of Appeals for the Second Circuit in another case, *Sweeney v. Schenectady Union Pub. Co.*, 122 F. 2d 288, to be capable of defaming, which decision was, in turn, affirmed by the Supreme Court of the United States: 316 U. S. 642.

That brings us to the second, and remaining, ground assigned by the majority as justification for the entry of judgment n. o. v. for the defendant. The majority opinion holds that the publication was privileged as a matter of law and that the plaintiff failed to prove that the defendant abused the privilege. That conclusion, I submit, is manifestly in error.

In an unbroken line of cases in this State over many years, it has been held with respect to a defense of privilege in an action for defamation that the defendant must prove that the publication was "made upon a proper occasion, from a proper motive, in a proper manner *and based upon reasonable or probable causes*" (Emphasis supplied) : *Hartman v. Hyman & Lieberman,* 287 Pa. 78, 83, 134 A. 486; see also *Bausewine v. Norristown Herald, Inc.,* 351 Pa. 634, 645, 41 A. 2d 736; *Stevenson v. Morris,* 288 Pa. 405, 409-410, 136 A. 234; *Montgomery v. New Era Printing Company,* 229 Pa. 165, 167, 78 A. 85; *Conroy v. Pittsburgh Times,* 139 Pa. 334, 338, 21 A. 154; *Diamond v. Krasnow,* 136 Pa. Superior Ct. 68, 76-77, 7 A. 2d 65; *Williams v. Kroger Grocery & Baking Co.,* 133 Pa. Superior Ct. 1, 9, 10, 1 A. 2d 495, affirmed 337 Pa. 17, 10 A. 2d 8; and *McGeary v. Leader Publishing Co.,* 52 Pa. Superior Ct. 35, 47. The burden of proving *all* the facts necessary to bring one within the immunity of a privileged communication is upon the one claiming the privilege: see *Hartman v. Hyman & Lieberman,* supra, at pp. 83-84, and cases there cited; also *Diamond v. Krasnow,* supra, at p. 76.

The proofs concerning the steps taken to verify the story about McAndrew did no more than raise a question of fact as to whether the defendant had reasonable and probable cause for its professed belief in the truth of the communication. According to the evidence adduced by the defendant, its first knowledge of the meeting at Mayfield, referred to in the communication, came to its city editor, Phillips, in a telephone conversation from a

522

political partisan, Harold A. Scragg, Esq., who gave Phillips but. an outline of the story. Phillips asked Scragg where he had gotten the information; Scragg said in a telephone call from Joseph Marzzacco, the latter being secretary of the Republican County Committee and an active participant in the heated campaign. Scragg also said that James Scoblick, the Republican candidate in the district for Congress, had been at the meeting. Both Marzzacco and Scoblick, and their political activity, were well known to Phillips who contacted them by telephone and from the information which they gave him, he wrote and published the communication involving McAndrew. Thus, the question presented was whether the information furnished the editor of the defendant paper by the two active partisans of like political affiliations, open as they were to the imputation of political bias, concerning what a member of the opposite political party was supposed to have said in a public speech was sufficient to constitute reasonable and probable cause for the paper's belief in the truth of the information so furnished or should the editor have checked further to verify the allegations, especially before publishing one of them within quotation marks as the exact words of the alleged orator. Obviously, that question was for the jury. The learned trial judge fairly and adequately submitted that question to the jury which properly found that the defendant had failed to sustain its burden of proving reasonable and probable cause.

The case of *Montgomery v. Dennison,* 363 Pa. 255, 69 A. 2d 520, which the majority opinion cites and relies upon, makes no change in the well-settled law of this State, nor were the references there made to §613, Restatement, Torts, intended so to do. The fact is that many of the cases hereinabove cited in support of the Pennsylvania rule conferring immunity because of privilege are likewise cited and relied upon in the *Dennison* case which inherently demonstrates that nothing new

in the law of libel was being thereby attempted. Thus, at page 263, Chief Justice MAXEY approvingly observed that "In *Conroy v. Pittsburgh Times,* 139 Pa. 334, 21 A. 154, Justice MITCHELL said: 'The natural and logical order of proof is for defendant to show the information on which he relied for probable cause, and for the plaintiff then to meet it in rebuttal. And this is the order that seems to be indicated by BRACKENRIDGE, J., in Gray v. Pentland, 2 S. & R. 23. . . .' " Again, at pages 265-266, the opinion in the *Dennison* case continues as follows: "The anonymous information Dennison acted on clearly did not constitute probable cause for the action he took. What Judge ORLADY speaking for the Superior Court in *Collins v. News Co.,* 6 Pa. Superior Ct. 335, 336, said is particularly applicable here: 'It was not a privileged communication. The authorities on which the appellant relies to sustain the argument that it was such, are considered in Coates v. Wallace, 4 Pa. Superior Ct. 253, and cannot relieve the defendant in this case. It is not sufficient that the defendant believed the facts to be true at the time of publication; *the belief must have rested on reasonable and probable cause*: Winebiddle v. Porterfield, 9 Pa. 137; Chapman v. Calder, 14 Pa. 365; Smith v. Ege, 52 Pa. 419' (Italics supplied)."

In an action for defamation where privileged communication is a defense, the plaintiff is not required to negative reasonable and probable cause for belief on the part of the defendant until the latter has offered proof of the sources of information upon which he relies for cause. As Mr. Justice MITCHELL further said in *Conroy v. Pittsburgh Times,* supra, "Actual or special malice can rarely be proved; in fact, it rarely exists. Libelous articles in newspapers seldom spring from any hostility to the individual, but usually from a ruthless disregard of personal feelings and private rights, in the mad hunt for news and sensations. The only chance of redress for

the plaintiff, therefore, is, ordinarily, the want of probable cause; and how is he to prove this? It was held in Flitcraft v. Jenks, 3 Wh. 158, that he could not do it by evidence of good character and the consequent improbability of his doing the act charged; and how is he to prove specific facts in the dark, before the facts relied on as probable cause are shown by defendant?" Then follows the presently pertinent statement already quoted in the *Dennison* case, supra. See also footnote 2, page 263, of *Montgomery v. Dennison*, supra.

Finally, this seems to me to be an appropriate occasion to register a protest against the allowance of *allocaturs* in cases such as the present. The appeal from the judgment of the court below was properly to the Superior Court. In the very first year of that court's existence, Mr. Justice MITCHELL, speaking for this court in *Kraemer v. Guarantee Trust & Safe Deposit Co.*, 173 Pa. 416, 418, 33 A. 1047, said "The authority of the Justices of the Supreme Court to allow special appeals [from the Superior Court] is not limited, but it is apparent from the general scheme of the act that it is intended to be exceptional and based on considerations other than the mere desire or interest of the particular parties. The most obvious of such considerations are the bearing of the question on public interests or rights, the importance of the decision as a precedent in frequently occurring litigation, diversity of opinions in other courts and consequent desirability of a final determination, and generally the preservation of uniformity in the application of legal principles. Unless these or similar considerations suggest a review by this court, the final and conclusive character of the judgments of the Superior Court ought not to be questioned or in any way trenched upon." As none of the *specified* considerations was present, there was no legal justification for the *allocatur*.