## Americans for Democratic Action et al. v. Meade et al.

*P. H. Strubing*, for plaintiffs.

*M. H. Morgan*, for defendants.

LEVINTHAL, J., June 20, 1950.—On January 6, 1950, we dismissed all the preliminary objections to the complaint in this case (except the objection relating to the averments of special damages).

Because of the decision in McAndrew v. Scranton Republican Publishing Company, 364 Pa. 504, and particularly because of certain statements in the majority opinion of the Supreme Court, we have deemed it necessary to hear reargument and to restudy the questions raised by defendants.

Plaintiff is an unincorporated association organized for the avowed purpose of preserving and extending democracy, achieving freedom and economic security, and enlarging fundamental liberties and international coöperation. Its constitution declares "that all forms of totalitarianism, including Communism, are incompatible" with its objectives, and that it welcomes as members "only those whose devotion to the principles of political freedom is unqualified". The complaint alleges that in September 1949, during the local municipal election campaign, defendants published statements to the effect that the ADA was "Communist infiltrated", that members of the Communist Party had "gone underground" in it, that the ADA had "flirted

with Communism", that "ADA included among its members Communist Party liners and pinks", and that "the Federal Department of Justice has thoroughly exposed the threadbare communistic tactic of dressing up its 'front organizations' with the names of prominent and unknowing dupes". The statements of defendants also charged that Communist "party liners" were supporting the leaders of plaintiff association in their campaign for election to office.

Plaintiff attempted to seek recovery of both general and special damages for the foregoing alleged defamation. We held that the averments of special damages lacked definiteness, and we sustained the preliminary objection to paragraph 7 of the complaint for this reason. See Pa. R. C. P. 1019 (f) : "Averments of . . . items of special damage shall be specifically stated."

We dismissed as untenable all the other preliminary objections which were based upon the contention that plaintiff, as an unincorporated nonprofit association, cannot sue for libel without claiming special damages, and that, even if it can so sue, the statements published by defendants are not defamatory and therefore not actionable.

In the case of Hotel, Restaurant, etc., Union v. Hotel & Club Employment Union, 56 D. & C. 575, 579 (1946), an action in libel instituted by an unincorporated labor union was sustained. It was there held that "a false statement, bringing plaintiff union into disrepute among the employes of the industry, is injurious to its business and is libelous per se. Accordingly, an averment of special damages is unneccessary".

So, also, in Kirkman et al. v. Westchester Newspapers, Inc., et al., 261 App. Div. 181, 24 N. Y. S. (2d) 860 (1941), it was held that an unincorporated labor union may sue for libel, without claiming special damages. It was there said:

"If falsehoods are circulated concerning the conduct by its officials of the affairs of a labor union . . . the confidence of the public in the labor union is lost and its efficiency is thereby impaired."

See also New York Society for the Suppression of Vice v. Macfadden Publications, Inc., 260 N. Y. 167 (1932) ; Finnish Temperance Society v. Finnish Socialistic Publishing Co., 238 Mass. 345 (1921) ; and Chinese Empire Reform Assn. v. Chinese Daily Newspaper Publishing Co., 13 Brit. Col. 141 (1907). In these cases it was held that a so called benevolent association may sue for libel without claiming special damage, if the false statements impugn the integrity of the society in executing the purpose for which it was organized, and if the society is likely to be brought into disrepute by reason of such false statements.

The basic question in this case, therefore, is whether the statements published by defendants concerning plaintiff association are capable of the meaning ascribed to them by plaintiff, viz., "that ADA has Communist members, harbors Communists, espouses Communist doctrines, is influenced in its policies by Communists or Communism, and that candidates for public office supported by ADA were consequently receiving support from Communists", and whether such statements are defamatory.

The Restatement of the Law of Torts, §559, defines a defamatory communication as follows:

"A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."

Comment d adds that "it is not necessary that the communication actually cause harm to another's reputation or deter third persons from associating or dealing with him. Its character depends upon its general tendency to have such an effect."

Mr. Justice Horace Stern has succinctly pointed out the relative functions of the court and the jury in a case of libel:

"The test is the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate. The words must be given by judges and juries the same signification that other people are likely to attribute to them. It is for the court to determine whether a publication is fairly and reasonably *capable* of the meaning imputed to it by the innuendo, leaving it to the jury to say whether it *actually* conveys the meaning so ascribed to it": Boyer v. Pitt Publishing Co., 324 Pa. 154, 157 (1936).

At the original argument on the preliminary objections, it was conceded by counsel for defendants that to say a man is a Communist or a Communist sympathizer is to defame him. It was, however, argued that the statements published by defendants merely charged that some unnamed members of plaintiff association were Communists and that nothing defamatory was said about the ADA as such. It is clear to us that a charge of "flirting" with Communism, coupled with a charge that plaintiff was "infiltrated" with Communists, together with the oblique reference to Communist "front organizations", must be regarded by the court as fairly and reasonably capable of the defamatory meaning imputed to it by the innuendo in the complaint in this case.

In the leading case of Grant v. Reader's Digest Assn., Inc., 151 F.(2d) 733 (CCA 2, 1945), cert. den. 326 U. S. 797, Judge Learned Hand took it as settled law that an imputation of Communism was defamatory, and went on to declare that any difference between saying that a man is a Communist and saying that he

sympathizes with its objectives and methods is a difference of degree only:

"Those who take it ill of a lawyer that he was a member of the Party, might no doubt take it less so if he were only what is called a 'fellow-traveler'; but, since the basis for the reproach ordinarily lies in some supposed threat to our institutions, those who fear that threat are not likely to believe that it is limited to party members. Indeed, it is not uncommon for them to feel less concern at avowed propaganda than at what they regard as the insidious spread of the dreaded doctrines by those who only dally and coquette with them, and have not the courage openly to proclaim themselves."

In Spanel v. Pegler et al., 160 F. (2d) 619 (7th Cir., 1947), there was no direct charge that plaintiff was a Communist or even a sympathizer. There was merely the inference that plaintiff behaved like other "demagogues of the extreme left". The court held these words were actionable:

"We must evaluate the effect rather than the form of the language as a whole . . . an ordinary reader *could* understand the article to mean that Spanel is a . . . Communist sympathizer. . . ."

See, also, the numerous other authorities cited in the unanimous opinion of the Superior Court of Pennsylvania in the McAndrew case, 165 Pa. Superior Ct. 276, and in the dissenting opinion of Mr. Justice Jones, 364 Pa. 517.

Counsel for defendants contend that regardless of what the law may be elsewhere, the McAndrew case establishes the law of Pennsylvania, binding upon all judges in our Commonwealth, that "to say that a man is a Communist . . . is not to defame him". It is true that in his opinion in the McAndrew case, Chief Justice Maxey actually did declare (at page 514) that "to say a man is a communist or a socialist is not to defame

him. There is no fundamental difference between these isms. Their objectives are the same." We are of the opinion that the facts in the McAndrew case are clearly distinguishable from those before us, and that, with all due respect to the author of the majority opinion in that case, we are not bound to follow what is manifestly mere obiter dictum. It was Chief Justice Maxey himself who said:

"It is an elementary proposition that the decision in any case is authority only on the question the record presents for decision. It is settled that 'an opinion expressed by a court, but which, not being necessarily involved in the case, lacks the force of an adjudication . . . (obiter dictum), . . . while entitled to respectful consideration as expressing the view of the judge by whom it was uttered, is not binding as authority within the stare decisis rule' ": Dauphin Co. Grand Jury Investigation Proceedings (No. 3), 332 Pa. 358, 370 (1938).

In the McAndrew case defendant newspaper was alleged to have falsely reported that plaintiff, in the course of a political speech delivered on October 28, 1947, had declared: "Of course, we all have to have a little Communism today." The majority of the Supreme Court decided that this statement was not libelous. The majority opinion, at page 513, expressly says:

"For one to favor a 'little Communism' does not mean that he favors the overthrow of our government by force or that he endorses any other illegal, immoral or unpatriotic program."

It is obvious that "an imputation may be defamatory as applied to one person at a given time and place, although it would not be derogatory of another person at a different time or at a different place": A. L. I. Restatement of the Law of Torts, §614, comment c. The

Supreme Court's statement that "to say a man is a communist is not to defame him", could not have been intended as an immutable principle of law binding for all time and under all circumstances.

One may question the factual accuracy of the late chief justice's statements that in the fall of 1946 (when the newspaper report was published) "the relations between the United States and Russia were very friendly, and the public mind had not then identified Communism with Russian imperialism and terrorism", and that "there is no fundamental difference between" Communism and Socialism.[1] It is clear that the relations between our country and the Soviet Union have worsened enormously during the "cold war" since 1947, that American public opinion with respect to Communism, Communists, Communist Party sympathizers and Communist front organizations has become steadily and increasingly more bitterly antagonistic, and that certainly in the fall of 1949 the public mind had definitely identified Communism not only with Russian imperialism and terrorism, but also with disloyalty, subversion, conspiracy and even treason.

The statement attributed to McAndrew manifestly referred to Communism as an economic and social ideology, similar in its ultimate objectives to socialism.

---

[1] It is, of course, true that both these isms are alike in being opposed to private capitalism, but there can be no doubt that the term "Communism" is usually applied to revolutionary currents aiming at the violent overthrow of the entire social structure, and the establishment of a collective form of production, while "Socialism" stands for moderate tendencies advocating social reforms and a gradual and lawful change of the existing system. Thus, the Labor Party and the Labor Government of Great Britain are "Socialist", while the Government of the Soviet Union is "Communist". It is well known that Communism as a world-wide movement is an offshoot of the Russian Bolshevik Party, which seized power as a result of the November Revolution of 1917 in Russia. See Franz Borkenau's World Communism: The History of the Communist International (1939), W. W. Norton & Co.

That statement obviously did not condone "a little Communism" in the sense of "a little Russian terrorism or imperialism" or "a little treason to the government of the United States", or even "a little violence, intimidation or conspiracy". The charges against the ADA, on the other hand, were published in the fall of 1949, at a time when most Americans realized how spurious was the Communist Party platform of 1948 with its grandiose, Utopian preachments "of a society that would forever banish war, poverty and race hatred, and would realize the vision of the brotherhood of man". In the fall of 1949 American public opinion looked behind the facade of the Communist Party and considered it "a conspiratorial and revolutionary junta, organized to reach ends and to use methods which are incompatible with our constitutional system": Mr. Justice Jackson's concurring opinion in United Steel Workers of America v. National Labor Relations Board, 339 U. S. 382, 94 L. ed. 621. Certainly, Mr. Justice Jackson gave expression to the prevailing opinion of the overwhelming majority of our population when he declared that "the goal of the Communist Party is to seize powers of government by and for a minority, rather than to acquire power through the vote of a fair electorate"; that "the Communist Party alone among American parties, past or present, is dominated and controlled by a foreign government"; that "it is a satrap party which, to the threat of civil disorder, adds the threat of betrayal into alien hands"; and that "American Communists, like Communists elsewhere in the world, place Moscow's demand above every patriotic interest. . . ."

It may also be noted that the statement in the McAndrew case is essentially different from the charges levelled against the ADA. McAndrew was reported to have declared: "Of course we all have to have a little Communism today." This was alleged to have been said by way of apology in reply to a charge that Com-

munism had "found a home in the Democratic Party". Obviously, the words attributed to McAndrew did not indicate that he was a Communist or even a Communist sympathizer. To "have to have" a thing does not mean "to want to have it", but rather "to be compelled to have it even though unwanted". And to say "we *all* have to have a *little* Communism" would imply, in the context in which these words were published, that all Americans are compelled to reconcile themselves to small doses of "Communism" in the form of so-called progressive, public welfare legislation. In the instant case, on the other hand, the charge that the ADA "flirted" with Communism indicates that the organization welcomed the "infiltration" of Communists. Indeed, the very words "flirted", "infiltrated" and "front organization" have an insidious connotation, implying that plaintiff association invited the infiltration of those with whom it had flirted, and that it was willingly, rather than involuntarily, being used as a "front organization" by the Communists. These statements concerning an association which, as alleged in the complaint, publicly purported to be opposed to all forms of totalitarianism, including Communism, may reasonably and fairly be regarded as equivalent to charging plaintiff with hypocrisy and deception, with actually espousing Communist doctrines while pretending to oppose them.

We have no doubt that the statements published by defendants concerning plaintiff association were fairly and reasonably capable of the defamatory meaning imputed to them by plaintiff in its complaint. It is for the jury, and not for us, to pass on whether the statements actually conveyed the meaning so ascribed to them.

Our order of January 6, 1950, dismissing defendant's preliminary objections (except objection no. 14) is hereby reaffirmed.