## Bricker v. Flatch

*Roland S. Sykes* and *John S. Neal, Jr.*, for plaintiff.

*John P. Fullam, Grim, Cadwallader, Darlington & Clarke*, and *I. Louis Rubin*, for defendant.

SATTERTHWAITE, J., January 21, 1955.—This is an action of trespass by which plaintiff, Glenn W. Bricker, seeks to recover damages from defendant, Frank F. Flatch, for an alleged libel. Defendant's preliminary objections are twofold: A motion to strike off surplusage in both the caption and the complaint, and a demurrer.

The action was commenced, not by complaint, but rather by praecipe for a writ of summons, filed, in fact, only two days after the publication of the alleged libel. In the praecipe, plaintiff included in the caption of the case, after the name of defendant, the additional words: "individually and as President of the Bucks County C. I. O. Industrial Council and as Vice-President and Director of the Lower Bucks County Hospital." From such caption on the praecipe, which originally was the only document of record, even a legally trained mind, let alone the general public, would have had difficulty in definitely ascertaining what parties plaintiff sought to hold liable. The intention to involve others than the individual defendant was reasonably inferable, particularly in the lay mind. It was not until almost a month later when the complaint was filed, after plaintiff had been ruled to do so, that the true nature and parties to the action were exactly defined. In fact, as it turned out, the prayer for damages therein was directed to defendant Flatch alone. No pretense is now made that either the

labor union or the hospital were ever intended to be actual parties defendant.

Under these circumstances, defendant's motion to strike off the above-quoted language in the caption of the case and in the preamble to the complaint must be granted under Pa. R. C. P. 1017(*b*) (2) ; it is at least impertinent if not scandalous. We see absolutely no legitimate reason for including the same; the only possible purpose thereof would be an irresponsible attempt to embarrass the organizations named by creating the impression in the eyes of the public that they also were being sued in connection with a controversial public issue in what might be sensational litigation. The caption went far beyond the matters required by Pa. R. C. P. 1018; the surplusage should be stricken.

On the merits of the case defendant by demurrer challenges the sufficiency of the complaint to state a cause of action for defamation. In resolving this question, consideration must be given preliminarily to the legal principles defining the concept of libel and the respective functions of the court and of a jury in that type of proceeding. At the present stage of the case, of course, we are confined to matters of law and cannot consider matters of fact which are for a jury's final decision.

A libel may be defined to be any malicious publication written, printed or painted, which, by words or signs, tends to expose a person to ridicule, contempt, hatred or degradation of character: McCorkle v. Binns, 5 Binney 340; Pittock and Mills v. O'Neill, 63 Pa. 253; Barr v. Moore, 87 Pa. 385; Neeb v. Hope, 111 Pa. 145; Collins v. Dispatch Publishing Co., 152 Pa. 187; Schnabel v. Meredith, 378 Pa. 609, 612.

If the common understanding of mankind at once and without difficulty or doubt applies a libelous meaning to the writing declared on, then it is to be so con-

strued by the court as a matter of law: See Hayes v. The Press Co., Limited, 127 Pa. 642, 648; Drebin v. Jewish World Publishing Company, 262 Pa. 169, 172; Will, trading as National News Co. v. Press Publishing Co., 309 Pa. 539, 543. Usually, however, as in this case, the libelous character of the publication cannot be determined from the mere words alone and will then depend upon some or all of the following additional factors: the extrinsic circumstances and background of the document (known as the inducement: McIntyre v. Weinert, 195 Pa. 52), the connection or relation of the publication to the underlying situation and to plaintiff (known as the colloquium: Lukehart v. Byerly, 53 Pa. 418), and the explanation or interpretation of the words used, if such be necessary (known as the innuendo: Hays v. Brierly, 4 Watts 392). See A. L. I. Restatement of the Laws of Torts, §563, comment (f). Although technically the innuendo cannot supply the place of the colloquium (Maxwell v. Allison, 11 S. & R. 343), the more modern decisions recognize that the two are often interrelated and both concepts are now frequently included in the single term, "innuendo."

By whatever legal name they may be referred to, however, the distinction between matters of fact (or inducement) and matters of interpretation (or innuendo) must be kept in mind in the judicial determination of whether or not a particular publication is libelous. It is well settled, in this connection, that an innuendo or conclusion cannot alter, enlarge or extend the natural and usual meaning of the words used; its purpose is to explain or make explicit and applicable that which already factually appears and which might otherwise be ambiguous, as where the words themselves may be understood to have a double meaning under the circumstances: Gosling v. Morgan, 32 Pa. 273; Herst v. Borbidge, 57 Pa. 62; Price v. Conway,

134 Pa. 340; Naulty v. Bulletin Company, 206 Pa. 128; Sarkees v. Warner-West Corporation, 349 Pa. 365; Schnabel v. Meredith, 378 Pa. 609. Whether the conclusions of the innuendo may justifiably be derived from the language used under the extrinsic facts shown, that is, whether or not the writing is fairly and reasonably capable of being found libelous in nature under the circumstances, is a question of law for the court; only after such question has been resolved does it then become a question of fact for the jury to determine if the publication actually was defamatory: Pittock and Mills v. O'Neill, 63 Pa. 253; Pittsburgh, Allegheny and Manchester Passenger Railway Co. v. McCurdy, 114 Pa. 554; Price v. Conway, 134 Pa. 340; Collins v. Dispatch Publishing Co., 152 Pa. 187; Naulty v. Bulletin Company, 206 Pa. 128; Mengel v. Reading Eagle Company, 241 Pa. 367; Boyer v. Pitt Publishing Company, 324 Pa. 154; Sarkees v. Warner-West Corporation, 349 Pa. 365; Bausewine v. Norristown Herald, Inc., 351 Pa. 634; A. L. I. Restatement of Torts, §614.

With these principles in mind, we do not believe that plaintiff has made out a cause of action. The language involved is certainly not defamatory as to plaintiff in itself, and no sufficient extrinsic facts and circumstances are pleaded as possibly to justify libelous implications from any of the several meanings he urges. The complaint, after alleging that plaintiff is and was a competent and duly licensed doctor of medicine practicing in Levittown, charges that defendant, intending to damage plaintiff's professional reputation, falsely and maliciously made and extensively circulated a certain handbill or circular which is alleged to be the publication giving rise to the claim for compensatory and punitive damages here involved. The occasion for this circular was ostensibly an announcement or reminder urging subscribers and contributors to attend

a special organization meeting of the corporation of the new Lower Bucks County Hospital which was then nearing completion and about to begin operations. At this meeting, matters of policy relating to the administration and control of the hospital and its staff and facilities were to be decided. The purpose of the circular, as is apparent from its form and content, was to electioneer for the adoption of a certain plan of organization and for the rejection of another, the latter supposedly proposed by plaintiff. Whether or not the substantive contents and merits of the respective plans are involved does not appear since they were not pleaded, except to the extent that they are referred to in the handbill itself. This read, in part, as follows:

### WHAT KIND OF HOSPITAL DO WE WANT IN LOWER BUCKS COUNTY?

YOUR VOTE will decide on July 15. Every subscriber or contributor to the Lower Bucks County Hospital at any time in the last three years is eligible to attend and vote at the special hospital corporation meeting at 8:00 P.M. sharp at the hospital on Bath Road, Bristol Township. An amendment has been submitted by Dr. Glenn W. Bricker which would drastically upset the organization of our hospital.

### WHICH DO WE WANT?

*This is what we will have:* A FIRST-CLASS, METROPOLITAN HOSPITAL
1. *OPERATED* for the patients and people of Lower Bucks County.
2. *Controlled* by 11,000 subscribers and their elected board of directors. . . .

*This is what the Bricker Amendment will give us:* A THIRD-RATE, SMALL-TOWN HOSPITAL
1. *OPERATED* for the benefit of a few local doctors.
2. *Controlled* by medical politics and doctor politicians. . . .

5. *Closed* to incompetent doctors, whether in the county or in adjacent areas.

6. *Control* of the quality of medical care in our hospital by the subscribers and their elected board of directors. . . .

10. *A first-class hospital*, open to the best doctors and closed to the incompetents; under full control of the subscribers, their elected directors and their appointed chiefs of departments; giving medical care comparable to the best available anywhere in the Delaware Valley.

5. *Open* without qualification or control to every doctor inside the county.

6. *No Control* of the quality of medical care by subscribers or directors. . . .

10. *A third-rate hospital*, operated as a closed corporation for the protection of incompetents; denied to the specialists of the Delaware Valley, run by medical politics, and removed from control by the subscribers and their elected directors.

ATTEND THE HOSPITAL ASSOCIATION MEETING THURSDAY NIGHT, 8:00 P.M., AND DEFEND YOUR HOSPITAL.

*OPEN HOUSE: Tours of Hospital from 6 to 8 P.M.*
Board of Directors

LOWER BUCKS COUNTY HOSPITAL

The complaint states no other facts possibly bearing on the defamatory nature of the handbill by reason of the surrounding circumstances, merely averring the falsity thereof and alleging by way of innuendo that it "was intended to mean and was taken to mean by those who read the same that plaintiff is an incompetent doctor of medicine, who has no concern for the

medical and hospital needs of the community, who favors a hospital which would be rated as an inefficient, inadequately staffed, third-rate hospital, and who desires to gain control of the hospital in order to place the medical care of the public in the hands of a staff composed of incompetent doctors of medicine, incompetent members of the allied professions and of nonprofessional groups and/or incompetent individuals."

The allegation or innuendo so made of what was intended to be meant by the publication, and what it was taken to mean, add nothing to plaintiff's case. The law is concerned only with the fair and reasonable meaning as actually expressed in the phraseology involved considered in light of the surrounding circumstances; it does not depend upon what may subjectively have been intended thereby, nor what some particular person may have understood therefrom. "That test of . . . liability . . . is not what was his secret intent, but what is the meaning of his words": Goebeler v. Wilhelm, 17 Pa. Superior Ct. 432, 440.

"The liability of the party does not depend on his unexpressed intention, but on the meaning of the language used": McCormick v. Weinstein, 81 Pa. Superior Ct. 163, 166. Mere opinion evidence as to the defamatory meaning of the statement does not support the allegations of the innuendo and hence is incompetent: Pittsburgh, Allegheny and Manchester Passenger Railway Co. v. McCurdy, 114 Pa. 554.

There is no sound basis whatever for the alleged inference that plaintiff was stated to be incompetent or desired to gain control of the hospital for *any* purpose, whether good or bad. The language of the circular in itself by no possible stretch of the imagination makes either charge against plaintiff. Nor are there any background facts stated which would reasonably justify the conclusion that plaintiff was even indirectly accused thereof, such as possibly by reason

of his known connection or affiliation with the hospital so as to be embraced within those characterized as "incompetents" who would be "protected" by the criticized policy in the language of the tenth item of the right-hand column, or those called "doctor politicians" who would "control" the hospital under the second item. So far as appears, plaintiff had no greater or different association or identification with the management or staff of the hospital than any other private subscriber or contributor.

Counsel for plaintiff at the argument recognized this deficiency in their case and stressed, not the pleaded direct charge of incompetence mentioned in the complaint, but rather the alleged indirect insinuation thereof, which according to them, arose by reason of plaintiff's standing as a physician whose reputation would be damaged if he were publicly believed to advocate the policies so attributed to him. In our opinion, however, this inference cannot justifiably be drawn from the language in question; there is no reasonable implication therein that *plaintiff* believed or stood for a third-rate hospital or favored incompetence on the staff; no attack is made upon plaintiff's qualifications as a physician in any manner whatsoever. The publication sharply criticizes what it argues to be the *effect* of the proposals allegedly fostered by him, but we fail to see how this is any reflection whatsoever upon plaintiff himself, even by indirection. The circular merely sets forth the arguments of the writer as to the practical effects of plaintiff's proposal in connection with a controversial matter. Whether or not such critical arguments were justified we need not now decide, inasmuch as we do not purport to base this decision upon any question of privilege or fair comment. We do hold, however, that the implications urged by plaintiff are not fairly and reasonably justified and therefore the publication is not capable of

a defamatory meaning under the circumstances pleaded.

The often-quoted definition of a libel stated above must be qualified by the proposition that statements cannot be adjudged defamatory merely because they are annoying and embarrassing to the person to whom they are attributed; mere annoyance does not constitute libel: McAndrew v. Scranton Republican Publishing Company, 364 Pa. 504, 510. This qualification would seem particularly applicable to cases involving argumentative comments and conjectural implications as to the prophesied results or consequences of another's beliefs or statements in connection with matters of debate or controversy.

In the McAndrew case, supra, the alleged libel was a newspaper article reporting a political campaign meeting in which plaintiff was falsely quoted as saying that a rival candidate for office was trying to get sympathy votes by his Marine uniform and by carrying the flag, and further that plaintiff, in replying to opposition charges of communism in his own political party, had apologetically replied: "Of course, we all have to have a little Communism today." The plaintiff there claimed, as does plaintiff in the instant case, that the erroneous printed report of his remarks tended to lower him in the estimation of the community in which he lived and was therefore defamatory. Judgment on a verdict in his favor and affirmed by the Superior Court was reversed by the Supreme Court which held, as a matter of law, that the newspaper article was not capable of a defamatory meaning, and the innuendo was not justified by the language involved. Although the article may have been "in bad taste" and although it may have annoyed and embarrassed plaintiff, it was not libelous.

Two cases decided by the Third Circuit Court of Appeals also involved the determination of the alleged

libelous character of critical comment upon the nature and effect of one's beliefs as related to controversial issues. In Rutherford v. Dougherty, 91 F. 2d 707, plaintiff's discussions of religious matters as broadcast by a radio station were the subject of a letter written by Cardinal Dougherty to the department store which operated the radio facilities. The letter protested against plaintiff's talks on the ground that he thereby attacked the church for which defendant was the spokesman, misrepresented the teachings thereof and tended to "foment religious hatred and bigotry." In the letter defendant further threatened to boycott the store, expressing surprise that it had permitted exposure of its customers "to open insult and ridicule" by reason of plaintiff's radio program. Notwithstanding that defendant's communication severely castigated the alleged effects of plaintiff's activities and so might be thought to reflect on him personally, judgment for defendant on the ground that the letter was not libelous was affirmed.

Sweeney v. Philadelphia Record Co., 126 F. 2d 53, is particularly apposite to the instant case. There the newspaper article in suit had stated that plaintiff, a United States congressman, opposed the appointment of a named individual as a Federal judge because he was a "Jew, and one not born in the United States". On motion, the complaint was dismissed as not stating a cause of action, the publication not being libelous. After discussing the public official aspect of plaintiff's position as a congressman, the circuit court, in affirming the dismissal of the complaint, stated at page 55, as follows:

"We come therefore to the last phase of the case. Can it be said that the words printed were such as to expose the plaintiff as a private citizen to contempt, ridicule, hatred or degradation of character. . . . We must conclude that they are not. At the most the appel-

lant is charged with being a bigoted person who, actuated by a prejudice of an unpleasant and undesirable kind, opposed a foreign-born Jew for a judicial appointment. Let us assume that it was stated in the alleged libel that the plaintiff opposed the appointment of a candidate simply because he was an Eskimo born above the Arctic Circle. We think that this example makes obvious the absurdity of the plaintiff's position. Eskimos are not being persecuted. Jews are being widely persecuted. We think that it is the connotation of persecution, which when carried into the matter published concerning the plaintiff, gives it the fallacious aspect of being libelous per se. The libel does not allege that Congressman Sweeney persecutes foreign-born Jews. It states nothing more than that he opposes one for an important federal office on the grounds stated."

So, in the present case, it is the connotation of the words "third-rate hospital" and "incompetents" which gives the apparent fallacious aspect that plaintiff is being defamed. However, the handbill does not allege that plaintiff favors a third-rate hospital or that he either is incompetent himself or favors incompetence in others. The critical language relates solely to the alleged effect of the plan attributed to plaintiff, not to plaintiff himself. Plaintiff's pique by reason of the language in question is understandable but, on the present record at least, not actionable; he may well be annoyed and resentful thereof, but has not been defamed thereby.

At the argument, defense counsel urged that if the demurrer be sustained, the court should dismiss the complaint without leave to amend. We do not believe that we would be justified in taking such drastic action at this stage. It is conceivable that the complaint does not adequately and completely reflect the factual situation or inducement with respect to other possible ex-

trinsic circumstances not pleaded which might alter the results herein reached. If plaintiff wishes to amend, leave to do so will be granted. Compare Jones v. Clark, 3 Bucks Co. L. Rep. 293, 301-02, and cases cited; Lynch v. Martin, 4 Bucks Co. L. Rep. 91, 94.

### *Order*

And now, January 21, 1955, defendant's preliminary objections to plaintiff's complaint are sustained; it is directed that the words "individually and as President of the Bucks County C. I. O. Industrial Council and as Vice President and Director of the Lower Bucks County Hospital" appearing in the caption of the instant case, and in the preamble to the complaint, are hereby stricken from the record; it is further ordered and adjudged that plaintiff's complaint fails to state a cause of action.

Leave is hereby given to plaintiff to file an amended complaint within 20 days from this date. Upon failure to do so judgment shall be entered for defendant.