JAMES F. FLEMING & another[1] vs. PAUL A. BENZAQUIN
& another.[2]

Suffolk.   May 5, 1983. — September 16, 1983.

Present: HENNESSEY, C.J., LIACOS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Libel and Slander.*

Taken in context, certain statements made by a radio talk-show host
about the conduct of a State trooper who had stopped the host for
motor vehicle violations, including such terms as "absolute barbar-
ian," "meathead," "servile," "merciless," "dictators and Nazis," and a
reference to being left "stranded," could not be understood as state-
ments of fact and thus were not actionable. [180-186]

Derogatory statements of opinion based on disclosed statements of fact
are not actionable, even if the statements of fact are false. [186-187]

In an action for defamation by a State trooper against a radio talk-show
host who had expressed disparaging opinions about the trooper's con-
duct, the defendant was entitled to summary judgment in his favor
even though there was disagreement about the truth of a statement of
fact made by the defendant, where the statement, even if false, was
not defamatory and disparaging remarks based on the statement were
nonactionable expressions of opinion. [187-189]

CIVIL ACTION commenced in the Superior Court on
January 31, 1978.

Motions for summary judgment were heard by *Brady*, J.

After review was sought in the Appeals Court, the Su-
preme Judicial Court ordered direct appellate review on its
own initiative.

*Charles R. Parrott* (*Andrew J. McElaney, Jr.*, with him)
for Westinghouse Broadcasting Company, Inc.

*Thomas Arthur Hensley* for the plaintiffs.

---

[1] Kathleen T. Fleming.

[2] Westinghouse Broadcasting Company, Inc.

NOLAN, J.  This is an action for defamation, intentional in-
fliction of severe emotional distress, and loss of consortium
brought by James F. Fleming, a Massachusetts State police
officer, and Kathleen T. Fleming, his wife, against Paul A.
Benzaquin, the host of a nightly radio "talk show" on radio
station WBZ, and Westinghouse Broadcasting Company,
Inc. (Westinghouse),[3] which owned and operated WBZ.
The complaint specifies a number of comments allegedly
made by Benzaquin during his broadcast on June 13, 1977,
which the plaintiffs contend defamed Officer Fleming,
caused him severe emotional distress, and deprived his wife
of his consortium.  A Superior Court judge denied Westing-
house's motion to dismiss the complaint for failure to state a
claim on which relief could be granted.[4]  Mass. R. Civ.
P. 12 (b) (6), 365 Mass. 754 (1974).  Subsequently, the de-
fendants each moved for summary judgment, offering in
support a transcript of relevant portions of the program,[5]
portions of Officer Fleming's deposition, the memorandum
of the judge who denied the motion to dismiss, and a memo-
randum of law.  The Flemings opposed the motions, offer-
ing other portions of Officer Fleming's deposition and a
memorandum of law.  Another Superior Court judge
denied the motions without opinion.  The defendants were
granted leave to appeal the denials under G. L. c. 231,
§ 118, by a single justice of the Appeals Court.  The defend-
ants entered their appeal in the Appeals Court and we
transferred the case here on our own motion.  G. L.
c. 211A, § 10 (A).

---

[3] Since the commencement of this action Westinghouse has changed its
name to Westinghouse Broadcasting and Cable, Inc.

[4] Treating the motion as a motion to strike, Mass. R. Civ. P. 12 (f), 365
Mass. 754 (1974), however, the judge ordered that the plaintiffs' claim for
exemplary and punitive damages be struck.  See Stone v. Essex County
Newspapers, Inc., 367 Mass. 849, 860 (1975).
   The docket entries indicate that Benzaquin also filed a motion to
dismiss.  It appears that no action was ever taken on the motion.

[5] The accuracy of the transcript was established through the defendants'
request for plaintiffs' admission of accuracy to which the plaintiffs did not
respond.  Mass. R. Civ. P. 36, 365 Mass. 795 (1974).

The following facts are not in dispute.  Shortly after noon on June 13, 1977, Benzaquin, his daughter, and his two young grandsons were driving in Benzaquin's car on Route 123 in Norwell, on their way to the beach.  As they passed the State police barracks on Route 123, they were observed by Trooper Fleming, who was exiting from the driveway of the barracks in his cruiser.  Fleming noticed that Benzaquin's car did not have a license plate attached to the front, did not have an inspection sticker displayed on the windshield, and appeared to have an expired registration.  Using his siren and flashing lights, Fleming directed Benzaquin's car over into a parking lot alongside the road.  Benzaquin gave a number of explanations for the conditions Fleming had observed: namely, that the front plate had been stolen, that the inspection sticker had fallen from the windshield onto the dashboard, and that the Registry of Motor Vehicles or his insurance company had made an error on the registration of his car, which was newly purchased.  According to Benzaquin's statement on his program later that night, "I used a lot of loud voice, but I made it absolutely clear . . . the fact that I wasn't angry at him.  I was angry at my insurance company and I was more angry at the Registry of Motor Vehicles for making me vulnerable on the highway."

Fleming wrote up a ticket and explained that he could not allow Benzaquin to proceed in his car.  Rather than have the car towed, Fleming allowed Benzaquin to leave the car in the parking lot of an automobile dealership next to the lot where Benzaquin had pulled over.  After securing his vehicle, Benzaquin, his daughter, and his grandsons drove off with a friend whom he had called to pick them up.

At the start of his broadcast later that night, Benzaquin gave a description of the incident which he prefaced with statements that he was angry, felt oppressed, and was liable to be prejudiced.[6]  He stated that he wanted to describe

---

[6] Benzaquin also described a telephone call he had made to the State police public relations officer concerning the incident.  Nothing that was said during or about this call is at issue here.

the incident, "because it seems to me important that public servants remain servants and not make us servile to them." Benzaquin expressed his opinion that, in the circumstances, Officer Fleming could simply have given him a warning, told him to clean up his affairs, and sent him on his way. Fleming alleges that some of the statements in this description of events defamed him.

After describing the incident, Benzaquin invited people who were "outrage[d] about any kind of government bureaucracy" to telephone him during the broadcast. He also invited Officer Fleming to telephone and present his views. Benzaquin admitted that Fleming had cause to stop his car. During his discussion with one caller, Benzaquin stated that the stop occurred not far from his home and then suggested that Fleming could simply have followed him home. When another caller expressed her view that Fleming was simply doing his job, Benzaquin responded that, "I commend him for doing his job. But what I can't commend anybody for is not being reasonable enough to let us proceed to a place where we could change vehicles, where I could get those little boys out of the hot sun and away from danger. Instead, we were grounded. The vehicle was taken away from us." When a third caller expressed disbelief "that a trooper would just leave a person standing there stranded on the side of the road after he had impounded the car" and asked how Benzaquin had obtained a ride, Benzaquin replied that, "I got a ride. But I did it through my own initiative, no help from the State Police," and stated that Fleming had not offered him a ride. In various conversations with other callers, Benzaquin allegedly made the rest of the statements which Fleming claims defamed him.[7] On a number of occa-

---

[7] The complaint alleges that Benzaquin's statements "contained the following false and defamatory matter: (a) '. . . arrogants wearing troopers' uniforms like tights', (b) 'little monkey . . . you wind him up and he does his thing', (c) 'If someone in the car had been bleeding, that would have been tough too.' (d) '. . . not paying them to be dictators and Nazis.' (e) a . . . 'tough guy with a big gun on his hip', (f) 'This man is an absolute barbarian.' (g) a 'lunkhead', (h) a 'meathead', (i) 'It only takes one nut like

sions, Benzaquin reiterated that he was angry, likely to be biased, and that his listeners should take account of those facts. Near the end of the program, Benzaquin engaged in a discussion with a caller,[8] in which Benzaquin summed up

that to give the troop a bad name.' (j) 'If he has children of his own, I'm sorry for them already'."

The complaint also alleges that, "[t]he defendant, Paul A. Benzaquin, alleged that the plaintiff did not properly perform his duties as a Massachusetts State Police Officer and repeatedly stated that the plaintiff left the defendant and two small children 'stranded' along the road and 'in danger' of being hit by another vehicle, which was untrue. Trooper Fleming did, in fact, take precautions to guard the safety of the parties."

Finally, the complaint alleges that, "[t]he defendant, Paul A. Benzaquin, falsely and maliciously described the plaintiff's conduct in the performance of his duties as 'servile', 'unconscionable', 'reprehensible', 'merciless', 'an absolute outrage' and an 'attack' upon the defendant, Paul A. Benzaquin."

[8] BENZAQUIN: "Listen to me. Listen to me, Bob. You've heard me over the years."

CALLER: "I been listening to you a long time."

BENZAQUIN: "O.K. Now, have you ever heard me attack a police force, a police policy, or a police officer before?"

CALLER: "No, you surprised me tonight."

BENZAQUIN: "All right. And I think that I probably have a better record than most broadcasters in this city for pointing out the positive sides of police action. It happened that today I was annoyed at one police officer who happens to be a state trooper. And I thought that what he did was reprehensible. And I put it on the air. Now, granted, we did get some stories from police, from people who had bad police experiences. But we got some from people who had had good police experiences and I got just as many raps for what I said as boosts for what I said. So no harm is done there. We haven't generalized and I haven't allowed anybody to generalize about police policy or police brutality or anything else except one incident. One particular police officer, one offending motorist. And I'm the offending motorist. So no harm has been done beyond that beef. One officer . . . ."

CALLER: "I think if trooper Fleming is listening or any of his family is listening there's been harm done."

BENZAQUIN: "Well, sure. I want harm done, to be done to him. I'm sore at him."

CALLER: "Well, you want harm to be done to him for . . . ."

BENZAQUIN: "Yes, I do. I want him to know it was utterly unreasonable in my opinion for him to take me out of that automobile and ground those two little kids."

CALLER: "But this is what your courts are for . . . ."

BENZAQUIN: "Court can't help me when I've got two little kids standing by the side of the road, Bob."

his impression of the program, his motive for opening discussion of the incident, and his opinion that it was "utterly unreasonable . . . for [Fleming] to take me out of that automobile and ground those two little kids."

In his deposition, which was submitted to the judge in opposition to the defendants' motions for summary judgment, Fleming states that he offered to give Benzaquin and his family a ride home but that Benzaquin refused, saying he would arrange his own transportation. Fleming also states that he directed Benzaquin's car over into a parking lot where it was safe and out of the way of traffic. Other than this, the plaintiffs do not dispute the accuracy of Benzaquin's narration of the sequence of events in any significant respect.

The plaintiffs contend that Benzaquin's statements are false, defamatory statements of fact and therefore actionable. The plaintiffs contend further that, to the extent Benzaquin's statements represent only opinion, they are nonetheless actionable because they are based on a false statement of facts. The plaintiffs do not contend that the statements, if opinion, are actionable because they imply the existence of undisclosed, defamatory facts. See *Pritsker* v. *Brudnoy*, 389 Mass. 776 (1983); *Cole* v. *Westinghouse Broadcasting Co.*, 386 Mass. 303, 312-313, cert. denied, 459 U.S. 1037 (1982); Restatement (Second) of Torts § 566 (1977). We consider first whether the statements could reasonably have been understood as assertions of fact.

1. *The Statements as Fact or Opinion.*

"In deciding whether statements can be understood reasonably as fact or opinion 'the test to be applied . . . requires that the court examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to

which it is published.'" *Cole* v. *Westinghouse Broadcasting Co.*, *supra* at 309, quoting from *Information Control Corp.* v. *Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir. 1980). See *Myers* v. *Boston Magazine Co.*, 380 Mass. 336, 341-342 (1980). We apply this test to the statements challenged here.[9]

Many of the statements complained of, in context, fall readily into the categories of ridicule and simple verbal abuse. See Restatment (Second) of Torts § 566 comments d and e (1977). The terms "arrogants,"[10] "little monkey," "tough guy," "absolute barbarian," "lunkhead," "meathead," and "nut," by which Benzaquin apparently referred to Fleming and the terms "servile," "unconscionable," "reprehensible," "merciless," and "absolute outrage," which Benzaquin apparently used to characterize Fleming's conduct are no more than either Benzaquin's "harsh judgment," clearly based on the facts he disclosed, *id.* at comment d, or "mere vituperation and abuse," *id.* at comment e.[11] While the statements did not arise in the course of the

---

[9] The judge who ruled on the motion to dismiss determined that three of the allegedly defamatory statements appeared to be "matters which can be proven false — and which would therefore be legitimate grounds for suit." Because he did not have the benefit of a transcript to determine the context of the statements, the judge denied the motion to dismiss. The parties disagree as to whether the judge, by specifically referring to three statements as possibly actionable, intended thereby to dismiss the other statements as nonactionable. However, the judge made no specific disposition concerning the other statements when he denied the motion to dismiss and the record does not reveal whether the judge who ruled on the motions for summary judgment limited his consideration in any way. We therefore consider all of the allegations contained in the complaint.

The judge referred to the three statements as follows:

"1. The assertion that plaintiff attacked the defendant;

"2. The allegation that plaintiff left defendant and two small children stranded along the road and in danger of being hit; and

"3. The 'Nazi' reference, which in its full context might be understandable as a charge that the plaintiff is a 'Nazi'."

[10] In the transcript, the word appears as "arrogance." Nothing turns on this discrepancy.

[11] We use the word "apparently" because, in some instances, it is unclear whether Benzaquin was referring specifically to Fleming or to State police officers generally. For purposes of discussion here, we will assume that all of the terms referred to Fleming personally or to his conduct.

classic face-to-face confrontation, Benzaquin repeatedly told his audience that he was angry and upset and warned that they were "hearing a lot of noise that doesn't have to do with the facts." Benzaquin also disclaimed any intent "to say anything about [Fleming] as a person" or to "say he's unfit or any of the other things that might be said by generalities." Further, as was the case with the statements at issue in *Cole* v. *Westinghouse Broadcasting Co.*, 386 Mass. 303 (1982), "[t]he meaning of these statements is imprecise and open to speculation. They cannot be characterized as assertions of fact. They cannot be proved false. 'An assertion that cannot be proved false cannot be held libellous'" (citation omitted). *Id.* at 312.

Benzaquin's statements that "if [Fleming] has children of his own, I'm sorry for them, already," must be viewed as an expression of opinion based on Benzaquin's description of events. There is no assertion of fact concerning Fleming within the statement. The plaintiffs do not argue that the statement implied the existence of nondisclosed, defamatory facts nor, in context, could such an implication be reasonably understood. Benzaquin's assertion that he "[is] sorry . . . already," is not, in itself, a defamatory statement of fact. The comment can only be reasonably understood to suggest that, if Fleming treated any children he had as he had treated Benzaquin's grandchildren, Benzaquin would consider the treatment outrageous. Compare Restatement (Second) of Torts § 566 comment c, illustrations 5 (1977).

Benzaquin's use of the word "attack," cannot be viewed as a defamatory statement of fact. In context, it is clear that Benzaquin was using the term figuratively to express his strong criticism of Fleming's conduct. He used the term only after a caller had used it to characterize a discussion Benzaquin had had on an earlier program concerning police conduct.[12] It could not have been understood as referring

---

[12] When the caller expressed his view that Benzaquin had "attacked the police in a way," on an earlier program, Benzaquin replied: "I didn't Barry. I don't attack police except today. If the police attack me, I'll attack them. Bum rap, though, to put two little kids by the side of the road. I'm not going to forget that one."

to a physical assault. Indeed, both within the immediate conversation and later in the program in conversation with another caller, Benzaquin used the word "attack" figuratively to describe his own criticism of Fleming's conduct.[13] See *Greenbelt Coop. Publishing Ass'n* v. *Bresler*, 398 U.S. 6, 13-14 (1970) (use of word "blackmail" to describe plaintiffs' conduct could not be understood as statement of fact); *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers* v. *Austin*, 418 U.S. 264, 284 (1974) (publication of Jack London's definition of "scab" constituted defendant's figurative expression of opinion).

Similarly, Benzaquin's use of the words "dictators and Nazis" could not have been understood as statements of fact. When a caller stated that "[w]e're paying [the State police] to do a job and then you're getting mad when they do that job," Benzaquin answered, "No, I'm not paying them to be unreasonable. I'm not paying them to be dictators and Nazis." To the extent the terms refer to Fleming at all, they no more implied that Fleming was a totalitarian ruler or a member of the Nazi party than did the term "communism" in *National Ass'n of Gov't Employees, Inc.* v. *Central Broadcasting Corp.*, 379 Mass. 220 (1979), cert. denied, 446 U.S. 935 (1980), charge the plaintiff there "with complicity in the atrocities of Solzhenitsyn's Gulag Archipelago or other horrors distinctive of a totalitarian regime." *Id.* at 229. The terms "dictators and Nazis," "would most likely be taken by the audience as mere pejorative rhetoric, abusive of the plaintiff for what [he] had done or appeared to have done." *Id.* In addition, as was also the case in *National Ass'n of Gov't Employees, Inc., supra,* "[i]f the [words] carried some further meaning or overtone (which is very doubtful), it was too vague to be cognizable as the subject of a "defamation action." *Id.* See *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers* v. *Austin,* 418 U.S. 264, 268 (1974) ("a traitor to his God, his country, his

---

[13] The second instance occurred when Benzaquin asked a caller, "Have you ever heard me attack a police force, a police policy, or a police officer before?" See note 8, *supra.*

family and his class"); *Buckley* v. *Littell,* 539 F.2d 882 (2d Cir. 1976), cert. denied, 429 U.S. 1062 (1977) ("fascist," "fellow traveler" of fascism).

Finally, we consider the plaintiffs' allegations that Benzaquin "repeatedly stated that the plaintiff left the defendant and two small children 'stranded' along the road and 'in danger' of being hit by another vehicle."[14] The transcript reveals that the only time Benzaquin used the word "stranded" was in the following exchange after Benzaquin explained that he had had to make a telephone call to arrange transportation:

CALLER: "So you weren't stranded in the middle of a highway somewhere?"

BENZAQUIN: "No thanks to [Fleming] I wasn't stranded." Benzaquin then stated that Fleming had not offered him a ride. Previously, the same caller had asked Benzaquin whether Fleming had "actually just [left] you there stranded," and Benzaquin replied, "He told me I couldn't drive the vehicle." Later, when the same caller discussed with Benzaquin whether Benzaquin should have realized that his registration had expired, the colloquy reproduced in the margin occurred.[15] Even if we assume that Benzaquin adopted

---

[14] We are unable to find any place in the transcript where Benzaquin stated that, "[I]f someone in the car had been bleeding, that would have been tough too," as alleged in the complaint. We therefore do not consider the effect of this statement.

[15] BENZAQUIN: "Yeah, but somebody's supposed to send you something. You're supposed to feel [*sic*] out one of those foolish IBM cards. I got nothing. All of a sudden I'm a violator on the highway and I've got a cop who wants to put me away forever and leave these two kids out there to get hit by a vehicle."

CALLER: "No, I don't think he wanted to leave them to get hit by a vehicle out there. I'm sure he has children of his own too."

BENZAQUIN: "Well, if he has children of his own, I'm sorry for them, already."

CALLER: "But I really can't see that they left you there stranded. I find that very hard to believe."

BENZAQUIN: "You do? Okay, your husband is a State Trooper. . . . And I have a loud public voice and I've made a lot of noise tonight, and this can't be helpful to the State Police. I want you to present this whole thing to your husband next time you see him and ask him what he would [have] done under similar circumstances."

the caller's use of the term "stranded" during this latter part of the conversation, it is nonetheless clear against the overall background of the program, and in light of the previous uses of the word "stranded," that, as Benzaquin used or adopted it, the word could only be understood to represent Benzaquin's opinion of the plight in which he found himself after Fleming had refused to allow him to continue driving his car. As such, it would be an opinion based on disclosed, nondefamatory facts and nonactionable.[16]

For much the same reasons, Benzaquin's statement that Fleming "wants to put me away forever and leave those two kids out there to get hit by a vehicle," cannot be viewed as an assertion of fact. Rather, the audience could only reasonably understand the comment, especially in light of the obvious hyperbole, as Benzaquin's opinion of Fleming's attitude as evidenced by Fleming's refusal to let Benzaquin continue to drive his car. It could not reasonably be understood as an assertion that Fleming desired that the children be put in peril. To the extent Benzaquin's remark here and his later statement that he thought it unreasonable to refuse to let him continue to a place "where I could get those little boys out of the hot sun and away from danger," could be viewed as assertions that the place where Benzaquin was stopped was dangerous for the children, those assertions would again be but expressions of Benzaquin's subjective assessment of the situation as he described it, and so pure opinion.[17] Cf. *Thuma* v. *Hearst Corp.*, 340 F. Supp. 867,

---

[16] The word, as Benzaquin used or adopted it, might also be taken to refer only to the fact that he was not allowed to continue driving and therefore might be simply a statement of an undisputed, nondefamatory fact. We note that Benzaquin did repeatedly say that he had been "grounded" by Fleming. However, it is clear from context that Benzaquin was referring simply to Fleming's refusal to let him continue driving the car. Fleming himself used the word in his deposition when he stated: "I did deprive him of further driving of it for that day. He was temporarily grounded without transportation until I offered him some and stated that he could make his own arrangements if he wished, which he did."

[17] The plaintiffs do not argue that Benzaquin misstated any facts as to where he stopped his vehicle and do not challenge his repeated assertions that his grandchildren were forced to stand by the side of the road. Flem-

871 (D. Md. 1972) (father's statement that shooting of son by police officer was "cold-blooded murder," was, in context, "clearly hyperbole expressing the father's most vehement feeling that the shooting was completely unnecessary").

Although Benzaquin's statements might, in the aggregate, give the impression that he considered Fleming to be unfit for police work, we note again that Benzaquin specifically disclaimed any intent to characterize Fleming as generally unfit and referred only to his one encounter with Fleming as the basis for his opinion without intimating that he possessed other information. We conclude that, individually and taken as a whole, the challenged statements could not be reasonably understood as assertions of fact.

We consider now the plaintiff's contention that the opinions are nonetheless actionable because they are based on a false statement of fact.

2. *Liability for Opinions Based on False Statement of Fact.*
The Restatement of Torts §§ 566-567 (1938) took the position that expressions of defamatory opinions were themselves actionable. This position was based on a view of the common law that has been severely criticised. See Christie, Defamatory Opinions and the Restatement (Second) of Torts, 175 Mich. L. Rev. 1621, 1625-1632, 1640 & n.74 (1977). Whatever the historical validity of the position, it is

---

ing does state in his deposition that Benzaquin "pulled off the road approximately ten feet in from the highway [into a parking area] where it was safe, and that the parking lot was "out of the way of traffic," but Fleming makes no reference to where the children stood. Obviously, Fleming's assessment of the danger inherent in the situation does not make Benzaquin's contrary assessment an issue of fact when the facts underlying the assessments are not disputed. Further, we find no factual support for the plaintiffs' assertion that Benzaquin persisted in characterizing Fleming "as a Nazi who had deliberately jeopardized the safety of the two children." As we have held, Benzaquin's remarks concerning danger could only have been understood as opinion. The plaintiffs have not indicated, and we are unable to find, any place where Benzaquin made a factual statement concerning precautions that Fleming did, or did not, take for the safety of the Benzaquin party. Indeed, Fleming does not, aside from stating that he directed Benzaquin's vehicle off the road and offered a ride, refer to any safety precaution that he did take. We consider the issues surrounding the disputed offer of a ride in part 2 of this opinion.

no longer viable in light of Supreme Court decisions beginning perhaps with *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323 (1974), where the Court stated that for First Amendment purposes, "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact." *Id.* at 339-340. The Restatement (Second) of Torts § 566 (1977) has abandoned the position. The plaintiffs contend nonetheless that, because Benzaquin's statements were premised upon a false statement of facts, his opinions are actionable. We disagree.

We have, in a number of recent cases, discussed the law governing defamatory statements of opinion. See *Pritsker* v. *Brudnoy*, 389 Mass. 776 (1983); *Cole* v. *Westinghouse Broadcasting Co.*, 386 Mass. 303 (1982); *Myers* v. *Boston Magazine Co.*, 380 Mass. 336 (1980); *National Ass'n of Gov't Employees, Inc.* v. *Central Broadcasting Corp.*, 379 Mass. 220 (1979). Developing the "common ground" surveyed in *Gertz*, these decisions have recognized and adopted the view expressed in Restatement (Second) of Torts § 566 comment b (1977), that statements of opinion of the "pure" type — that is, opinions based on disclosed or assumed nondefamatory facts — are not actionable whereas statements of opinion of the "mixed" type — that is, opinions apparently based on undisclosed defamatory facts — are actionable. We have indicated that Benzaquin disclosed the facts upon which he based his opinion and the plaintiffs do not contend that he implied the existence of undisclosed, defamatory facts. By arguing that opinions based on disclosed but false facts are actionable, the plaintiffs apparently attempt to chart a middle course.

The Restatement sets forth four fact patterns which demonstrate "the effect of the rule that there can be no recovery in defamation for a pure expression of opinion." Restatement (Second) of Torts § 566 comment c, at 175 (1977). Two of these are relevant to the plaintiffs' claims here: "(1) If the defendant bases his expression of a derogatory opinion

of the plaintiff on his own statement of false and defamatory facts, he is subject to liability for the factual statement but not for the expression of opinion. (2) If the defendant bases his expression of a derogatory opinion of the plaintiff on his own statement of facts that are not defamatory, he is not subject to liability for the factual statement — nor for the expression of opinion, as long as it does not reasonably indicate an assertion of the existence of other, defamatory, facts that would justify the forming of the opinion." *Id.* These examples make clear that Benzaquin and Westinghouse will not be liable to the plaintiffs for Benzaquin's expression of opinion on disclosed facts even if the facts are false. However, Benzaquin would be liable for the disclosed facts provided they were both false and defamatory.

The only statement of fact in Benzaquin's narration of events with which the plaintiffs take specific issue is Benzaquin's assertion that Fleming did not offer him a ride. Since Fleming states in his deposition that he did offer Benzaquin a ride, we may take this averment as true for purposes of the motion for summary judgment. However, the defendants would still be entitled to summary judgment unless the truth or falsity of Benzaquin's assertion that his party was not offered a ride presented "a genuine issue of material fact," *Community Nat'l Bank* v. *Dawes*, 369 Mass. 550, 554 (1976), in the action.

Here the plaintiffs fall victim to their misperception of the defendants' potential liability. The plaintiffs contend only that Benzaquin's opinions should themselves be actionable and they fail to set forth any specific facts indicating that Benzaquin's statement that his party was not offered a ride, if false, was also defamatory. Without such facts, the truth or falsity of the statement is not a material issue in the action. Since the pleadings, taken together with the supporting materials, have failed to disclose that the plaintiffs have set forth facts in support of an action for defamation, the defendants were "entitled, as matter of law, to a judgment." *Community Nat'l Bank* v. *Dawes, supra.*

Our decision would be no different if we were to assume that the pleadings and supporting materials were sufficient to raise the issue of the defamatory character of Benzaquin's statement that he was not offered a ride. He stated that he was stopped about three-quarters of a mile from his house, about one-half mile from the police barracks, "in the center of Norwell." He also stated that he was able to make a telephone call to secure transportation and that he had "stopped at a very reasonable automobile dealership," where he was permitted to leave his car. It is apparent from this information that even those listeners who were not familiar with the area Benzaquin described could not have concluded that he had been stopped in an isolated or unpopulated area. We think it unlikely that in these circumstances a reasonable listener would consider Benzaquin's statement that Fleming did not offer him a ride as defamatory.

3. *Conclusion.*

The plaintiffs do not argue that their action for intentional infliction of emotional distress and loss of consortium would survive the loss of their action for defamation. We therefore need not decide the point. But see *Hutchinson* v. *Proxmire,* 579 F.2d 1027, 1036 (7th Cir. 1978), rev'd on other grounds, 443 U.S. 111 (1979) (action for intentional infliction of emotional harm must fall with the action for defamation); Restatement (Second) of Torts § 566 comment f (1977) (action for intentional infliction of mental distress subject to restrictions of First Amendment). We also need not consider the issues relating to the status of police officers as public officials although we note that the weight of authority leans toward classifying police officers as public officials. See Note, Police Defamation Suits Against Citizens Complaining of Police Misconduct, 22 St. Louis U.L.J. 676, 684-685 (1978). In sum, we conclude that the challenged statements could only be reasonably understood as expressions of opinion based on nondefamatory disclosed facts. We further conclude that opinions (as contrasted with false and defamatory statements of fact) based on disclosed but false statements of fact are not actionable because

they are mere opinion and not statements of fact. Therefore, we reverse the order of the Superior Court judge denying the defendants' motions for summary judgment and order that judgments for the defendants be entered.

*So ordered.*