848 P.2d 286

**Thomas N. TURNER, Plaintiff–Appellant,**

v.

**Barbara DEVLIN, Defendant–Appellee.**

**No. CV–91–0365–PR.**

Supreme Court of Arizona,
En Banc.

March 2, 1993.

Doherty, Alex & Tadano by Andrew R. Alex, Phoenix, for plaintiff-appellant.

Teilborg, Sanders & Parks by David J. Damron, R. Corey Hill, Phoenix, for defendant-appellee.

## OPINION

FELDMAN, Chief Justice.

Barbara Devlin petitions this court to review the court of appeals' decision in a defamation action brought against her by Thomas N. Turner. She argues that the First Amendment protects the speech in question. In light of the importance of the issues and the "enhanced appellate review" required to avoid "forbidden intrusion of the field of free expression," we granted review. *Yetman v. English*, 168 Ariz. 71, 76, 811 P.2d 323, 328 (1991) (citing *Bose Corp. v. Consumers Union, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); and quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21, 110 S.Ct. 2695, 2707, 111 L.Ed.2d 1 (1990)). We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and Ariz.R.Civ.App. 23.

## FACTS AND PROCEDURAL HISTORY

On the morning of April 14, 1988, Phoenix police officer Turner was dispatched to Desert Sky Junior High School to investigate a possible case of child abuse. Turner learned that a student had reported to school nurse Devlin complaining that his stepfather had beaten him the night before. Upon arrival, Turner and the student went into a private office to talk. The exact manner in which Turner conducted his investigation is disputed. The following day Devlin wrote a letter complaining that Turner's behavior was "rude and disrespectful" and asserting that "his manner bordered on police brutality."[1]

Investigating Devlin's complaint, Sergeant Jan Marshall of the Phoenix Police

---

**1.** The letter in its entirety is set out in the Appendix to this opinion. Devlin sent a copy of the letter to: (1) the Deer Valley Unified School Superintendent; (2) the Desert Sky Junior High School Principal; (3) the Special Services Administrator; (4) the Child Protective Services Program Manager; (5) the Union Hills Station Supervisor; (6) the Phoenix Chief of Police; and (7) the Mayor of Phoenix.

Department interviewed Devlin and Turner, as well as others who witnessed the April 14 incident. *See* Memorandum to Shift Commander, Apr. 27, 1988 ("April 27 Memo"). According to Marshall, Turner's conduct did not justify Devlin's assertion that he was rude or that his manner bordered on police brutality.[2] *Id.* at 6. Nevertheless, Marshall "partially sustained" Devlin's complaint, noting that Turner's choice of words "reflect[ed] disrespect" and "created an atmosphere where [Devlin] felt that the officer was accusing the victim of wrong doing." *Id.* at 6, 7. Marshall concluded that a "more professional approach should have been utilized." *Id.* at 7.

Marshall also related that Devlin's purpose in writing the letter was not solely to criticize Turner's handling of the incident. *Id.* at 5. Marshall reported that Devlin hoped her complaint would motivate the Phoenix Police Department to properly train its officers in juvenile interrogation techniques. *Id.* According to Marshall, Devlin reported that Turner "did a very good job with the entire investigation and was very efficient in accomplishing it." *Id.* Although Turner argues that Devlin's statements to Marshall amounted to an "uncontroverted and complete recantation" of the accusations contained in her letter, the record supports both parties' depiction of the events.[3]

Turner filed a defamation claim against Devlin in November 1988. Devlin moved for summary judgment and Turner for partial summary judgment. The trial court granted Devlin's motion and denied Turner's.[4] The court held that the record could not support by clear and convincing evidence a finding of actual malice and, relying on *Glaze v. Marcus*, 151 Ariz. 538, 729 P.2d 342 (Ct.App.1986), that Devlin's statements were nonactionable opinions. *Id.*

The court of appeals reversed. *Turner v. Devlin*, No. 1 CA–CV 90–113 (Aug. 8, 1991) (mem. dec.) (2–1 decision). The majority, relying on *Milkovich*, 497 U.S. 1, 110 S.Ct. 2695, held that Devlin's recantation to Marshall demonstrated that Devlin's statements were both false and provable as false. *Turner*, mem. dec. at 6. Relying on *Yetman*, 168 Ariz. 71, 811 P.2d 323, the majority also held that Devlin's statements could be interpreted as stating actual facts—presenting a question for the jury. *Turner*, mem. dec. at 7–8. Finally, the majority held that there was sufficient evidence of actual malice for jury consideration. *Id.* at 9–10. Judge McGregor dissented. She found that Devlin's comments were incapable of being proven true or false and thus were constitutionally protected. *Id.* at 12–14 (McGregor, J., dissenting).

We granted review to answer the following two questions:

1. Were the statements contained in Nurse Devlin's letter purely personal impressions, or rather factual assertions, capable of being proven true or false?

2. Did Nurse Devlin act with actual malice in writing the letter?

## DISCUSSION

### A. Actionability

 "To be defamatory, a publication must be false and must bring the defamed

---

**2.** According to Marshall's report, Devlin admitted the following: (1) she did not hear Turner "demand" that the student leave the nurse's office and stand against the wall in an adjoining office; the student probably was standing because there was only one chair; (2) she heard only five minutes of the thirty-minute interview, part of which was only questions or responses; (3) she did not explain to Turner the potential seriousness of the student's injuries; and (4) although Devlin stated that her depiction of Turner's conduct as bordering on police brutality was prompted by the type of questions asked by Turner, she could not recall a specific example of such a question. April 27 Memo at 4–5.

**3.** Several people witnessed different portions of Turner's investigation and related, by affidavit, accounts that coincide with both Devlin and Turner's description.

**4.** Over Devlin's objection, the trial court considered the police investigation reports in ruling on the summary judgment motions. Devlin did not pursue the issue in the court of appeals or before this court. For this reason, we consider the entire record as presented.

person into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty, integrity, virtue, or reputation." *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 341, 783 P.2d 781, 787 (1989). A complaint that falsely charges a law enforcement officer with misconduct may be defamatory and actionable, so long as constitutional requirements are fulfilled. *See, e.g., Selby v. Savard*, 134 Ariz. 222, 224–25, 655 P.2d 342, 344–45 (1982). Devlin claims that Arizona law and the First Amendment protect her criticism of Turner's conduct.[5] In this case, therefore, we must examine the interplay between the constitutional protection of free speech and the common law action of defamation. *See Yetman*, 168 Ariz. at 73, 811 P.2d at 325. Specifically, we are asked to address how the "fact-opinion" differentiation affects the constitutional protection of free speech. We first turn to the present state of the law on the question.

B. Legal Principles

In *Milkovich*, the United States Supreme Court rejected the contention that the First Amendment demands distinct constitutional protection for speech that is "opinion." 497 U.S. at 18, 21, 110 S.Ct. at 2705, 2707. Instead, the Court held that existing constitutional doctrine sufficiently protects such speech. *Id.* at 21, 110 S.Ct. at 2707. In *Yetman*, we outlined the protections discussed by the Court in *Milkovich:*

First, ... "a statement on matters of public concern must be provable as false before there can be liability under state defamation law."

Second, ... "[t]he [Supreme Court cases] provide protection for statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual...."

Third, ... the malice requirements ... provide additional protection for statements of "opinion" on matters of public concern that reasonably imply false and defamatory facts about public figures or officials.

Finally, ... enhanced appellate review ... in cases raising first amendment issues "provides assurance that the foregoing determinations will be made in a manner so as not to 'constitute a forbidden intrusion of the field of free expression.' "

*Yetman*, 168 Ariz. at 75–76, 811 P.2d at 327–28 (quoting *Milkovich*, 497 U.S. at 19–21, 110 S.Ct. at 2706–07) (citations omitted).

In the present case, we must determine whether the doctrines outlined in *Milkovich* protect Devlin's criticism. First, we examine two related questions: (1) if the criticism involves matters of public concern, whether it is provable as false, and (2) whether the criticism reasonably could be interpreted as stating actual facts about Turner. If so, because Turner is a "public official," *see Godbehere*, 162 Ariz. at 343–44, 783 P.2d at 789–90 (citing cases); *Selby*, 134 Ariz. at 224–25, 655 P.2d at 344–45, we also must determine whether the record supports, by clear and convincing evidence, that Devlin acted with the malice required by *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710. Because we dispose of the case on the first issue, we do not reach the malice question.

## ANALYSIS

In reaching our decision, we recognize that Devlin related a sequence of events, the basis of which is indisputably factual. Whether the stepfather beat the child, whether school officials called the police, and whether Turner requested that the student stand against a wall are unquestionably capable of being proven true or false. It is, however, Devlin's unflattering *characterization* of Turner's conduct that gives her letter defamatory color. Therefore, it is on those comments that we must concentrate.

Devlin's letter stated that (1) Turner "demanded that the student stand against the wall"; (2) "[t]he student was interrogated as if he, the victim, had committed an ille-

5. We have previously held that in this discrete area "the Arizona Constitution provides no greater privilege for otherwise defamatory statements than the [F]irst [A]mendment of the United States Constitution." *Yetman*, 168 Ariz. at 82, 811 P.2d at 334.

gal act"; (3) "[t]he officer was rude and disrespectful, and his manner bordered on police brutality"; and (4) "[t]here is no excuse for this outdated, uneducated behavior on the part of so important a group as our Police Department." *See* Appendix. We now apply the principles set out in *Milkovich* to these statements.

## A. Are Devlin's Statements a Matter of Public Concern?

■ A statement regarding matters of public concern must be provable as false before a defamation action can lie. *Milkovich*, 497 U.S. at 16, 19–20 & n. 6, 110 S.Ct at 2704, 2706 & n. 6. Because truth is an affirmative defense, the burden of proving falsity lies only on those plaintiffs who are defamed by speech that is a matter of public concern. As a threshold, therefore, we must determine whether Devlin's speech falls within this category. " 'Whether ... speech addresses a matter of public concern must be determined by [the expression's] content, form, and context ... as revealed by the whole record.' " *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761, 105 S.Ct. 2939, 2946, 86 L.Ed.2d 593 (1985) (plurality opinion) (quoting *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983)).

■ Devlin's letter criticizes a police officer acting in his official capacity.[6] "It is difficult to conceive an area of greater public interest than law enforcement. Certainly the public has a legitimate interest in the manner in which law enforcement officers perform their duties." *Godbehere,*

162 Ariz. at 343, 783 P.2d at 789. In deciding that a common law privilege[7] extends to complaints of police misconduct, Maryland's highest court spoke to the importance of such complaints:

> Our society vests its law-enforcement officers with formidable power, the abuse of which is often extremely detrimental to the public interest. Citizen complaints of such abuses, and the administrative disciplinary procedure which has been developed to investigate these complaints, serve a public function of vital importance by providing a mechanism through which abuses may be reported to the proper authorities, and the abusers held accountable.
>
> The viability of a democratic government requires that the channels of communication between citizens and their public officials remain open and unimpeded.

*Miner v. Novotny,* 304 Md. 164, 498 A.2d 269, 274–75 (1985).

■ We are not unmindful of the detrimental effect that false reports of police misconduct have on a police officer. *See Miner,* 498 A.2d at 275. This concern, however, does not make the subject any less public. Because there is a great need for uninhibited dialogue concerning the actions of so important an arm of government, especially with regard to the treatment of children, we hold that Devlin's comments involve matters of public concern. These statements, therefore, must be provable as false before a defamation action can lie.[8]

---

**6.** Turner concedes that he is a public official.

**7.** In reaching our decision, we do not address whether a common law privilege might protect Devlin against Turner's defamation action.

**8.** We recognize that the United States Supreme Court reserved judgment on whether this protection applies to non-media defendants. *See Milkovich,* 497 U.S. at 20 & n. 6, 110 S.Ct. at 2706 & n. 6 (citing *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 779 n. 4, 106 S.Ct. 1558, 1565 n. 4, 89 L.Ed.2d 783 (1986)). In this case, however, the plaintiff is a public official *and* the speech relates to a matter of public concern. The constitutional requirement that a public official-plaintiff show that a defamatory state-

ment was made with knowledge or reckless disregard of its falsity seemingly necessitates that the plaintiff first show that the statement is provable as false. *See Milkovich,* 497 U.S. at 20 n. 6, 110 S.Ct. at 2706 n. 6 (where the plaintiff is a public official or public figure, "the *New York Times* rule already require[s] a showing of falsity before liability [can] result."); *Hepps,* 475 U.S. at 775, 106 S.Ct. at 1563 (*New York Times* rule requires a public figure plaintiff to show falsity to prevail in a suit for defamation) (citing cases). Thus, when the plaintiff is a public official and the speech is of public concern, we believe the proper rule is that the plaintiff bears the burden of showing that a statement is provably false before an action for defamation can

## B. Were There Factual Disputes That Make Summary Judgment Improper?

Turner argues that Devlin recanted her accusation of police misconduct during her interview with Marshall. Devlin "emphatically denies" that such a recantation occurred. The court of appeals held that Devlin recanted her accusations, and this recantation demonstrated that her statements were false and thus provable as false. *Turner*, mem. dec. at 5–6. We disagree.

■ We need not determine whether Devlin recanted her statements. A subjective assessment does not suddenly become provable merely because the speaker later reevaluates the subject and formulates a different opinion. The Supreme Court in *Milkovich* addressed this very issue. The Court noted

> that the issue of falsity relates to the *defamatory* facts implied by a statement. For instance, the statement, "I think Jones lied," may be provable as false on two levels. First, that the speaker really did not think Jones had lied but said it anyway, and second that Jones really had not lied. It is, of course, the second level of falsity which would ordinarily serve as the basis for a defamation action, though falsity at the first level may serve to establish malice where that is required for recovery.

*Milkovich*, 497 U.S. at 20 n. 7, 110 S.Ct. at 2706 n. 7. Thus, Devlin's subjective belief as to the accuracy of her statements—whatever that subjective belief may be—does not determine whether the statements are provable as false.

The central debate in this case is not over *what* happened but, instead, how to *characterize* what happened. Outside of Devlin's characterization, however, Turner also disputes the factual accuracy of some of her comments. He disputes her report of the child's injuries—claiming they were not so severe. The bare facts of the reported injuries, however, do not defame Turner

because he was not charged with injuring the child. Nor is such a charge implied in the allegedly false statement. Also, Turner is not defamed by Devlin's assertion, or any implication from it, that he demanded that the student stand during questioning—a fact also disputed. It is only Devlin's characterization of the entire event that gives this statement any disparaging meaning.

In the present case, the disputed facts are not defamatory, nor do they imply the existence of undisclosed defamatory facts. Therefore, even assuming that the asserted facts were false, they are not actionable by themselves and do not affect the actionability of Devlin's other comments. *See* Restatement (Second) of Torts § 566 cmt. c at 175 (1977); *Fleming v. Benzaquin*, 390 Mass. 175, 454 N.E.2d 95, 103–04 (1983). In this case, therefore, the disputed facts are not material and, accordingly, do not prevent summary judgment. *See* Ariz. R.Civ.P. 56(c). We must, therefore, examine Devlin's statements and ascertain whether they are actionable because they are provable as false.

## C. Are the Statements Provable as False?

■ At common law the defendant has the burden of proving the truth of a defamatory publication as an affirmative defense. *Yetman*, 168 Ariz. at 81, 811 P.2d at 333. The Supreme Court, however, recognized that this common law arrangement inhibited First Amendment freedom in cases where damages are sought for speech of public concern. *See Hepps*, 475 U.S. at 776–77, 106 S.Ct. at 1563–64. The Court, consequently, declared a new rule requiring the plaintiff to prove falsity in such cases. *Id.; Yetman*, 168 Ariz. at 81, 811 P.2d at 333. This requirement "[f]oremost ... stands for the proposition that a statement on matters of public concern must be provable as false before there can be liability under state defamation law." *Milkovich*, 497 U.S. at 19–20, 110 S.Ct. at 2706.

lie. *See also Hepps*, 475 U.S. at 780, 106 S.Ct. at 1565 (Brennan & Blackmun, JJ., concurring) (*Hepps* rule should apply to both media and non-media defendants); *Dun & Bradstreet, Inc.,*

472 U.S. at 773 & n. 4, 105 S.Ct. at 2952–53 & n. 4 (White, J., concurring) (media defendants should be afforded no greater First Amendment protection than other defendants).

The Supreme Court illustrated the protection as follows:

> [U]nlike the statement, "In my opinion Mayor Jones is a liar," the statement, "In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin," would not be actionable. *Hepps* ensures that a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.

*Id.*

We believe that Devlin's assessment is within this characterization. The letter reveals nothing more than her subjective impression of Turner's "manner." The statements alleged to be defamatory contain no factual connotations that are provable. Devlin's characterizations of Turner's tone of voice as a "demand[ ]," of his interview as like a criminal interrogation, of his demeanor as "rude and disrespectful," and of his "manner" as "border[ing] on police brutality" and, by implication, as "outdated" and "uneducated" are plainly her personal impression of Turner's interview methods.

Surely, if Devlin perceived Turner's "demand" as a "request," Turner would not have objected. Similarly, a description of his interrogation as "questioning" would have drawn no protest. Nor would there be grounds for legal complaint had Devlin reported that his manner was "impolite" and his techniques "uninformed" rather than "rude," "disrespectful," "outdated," and "uneducated." To determine whether Turner demanded or requested the child to stand, whether his inquiry was more like a criminal interrogation rather than questioning, whether his manner was rude, disrespectful, outdated, and uneducated as opposed to something less offensive all lie beyond the realm of factual ascertainment or proof. Finally, instead of describing Turner's manner as "border[ing] on police brutality," if Devlin had chosen an analogy not so close to home (for example, bordering on barbarianism), the subjective nature of her criticism would be unassailable.

We can conceive of no objective criteria that a jury could effectively employ to determine the accuracy of Devlin's assessment. Whether her assessment is true or false is simply "not the kind of empirical question a factfinder can resolve." *Yetman*, 168 Ariz. at 81, 811 P.2d at 333. Unlike the word "communist," where the adherence to party doctrine can be used to evaluate the accuracy of the characterization, *see Yetman*, 168 Ariz. at 81 & n. 8, 811 P.2d at 333 & n. 8, absent an implication of physical abuse, Devlin's comments have no bench mark with which to judge their accuracy, *see Fleming*, 454 N.E.2d at 100 (harsh critique of police behavior held to be unprovable nonassertion of fact); *cf. Milkovich*, 497 U.S. at 21, 110 S.Ct. at 2707 (connotation of perjury was sufficiently factual to be proven true or false, noting that its truthfulness can be determined by looking to a "core of objective evidence"). *Milkovich* made clear that First Amendment protection should not turn on such an intensely subjective evaluation.

### D. Could Devlin's Statements Reasonably be Interpreted as Stating Actual Facts About Turner?

■ According to Devlin's letter, Turner grossly mishandled what apparently should have been a sensitive and delicate investigation. She chose words that could effectively convey her strong disapproval. To be actionable, however, such words must be capable of being reasonably interpreted as stating actual facts about Turner. *See Milkovich*, 497 U.S. at 16–17, 110 S.Ct. at 2704–05, 2706 (citing *Greenbelt Coop. Publishing Ass'n Inc. v. Bresler*, 398 U.S. 6, 14, 90 S.Ct. 1537, 1542, 26 L.Ed.2d 6 (1970) (holding that reference to negotiation technique as "blackmail" was nonactionable rhetorical hyperbole); *Hustler Magazine v. Falwell*, 485 U.S. 46, 50, 108 S.Ct. 876, 879, 99 L.Ed.2d 41 (1988) (holding that the First Amendment precluded recovery for emotional distress for advertisement parody that "could not reasonably have been interpreted as stating actual facts about the public figure involved"); *Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284–86, 94 S.Ct. 2770, 2781–82, 41 L.Ed.2d 745 (1974) (holding that use of the

word "scab," with a definition that included "traitor," was "merely rhetorical hyperbole" and was not a basis for a defamation action under federal labor law)). This requirement "provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich,* 497 U.S. at 20, 110 S.Ct. at 2706 (citing *Falwell,* 485 U.S. at 53–55, 108 S.Ct. at 880–82). Devlin's depiction of Turner's interview as like a criminal interrogation that bordered on police brutality falls within this protection.

Devlin's letter did not accuse Turner of physical abuse or brutality. Instead, Devlin *characterized* his interview as an interrogation conducted *as if* the student had committed an illegal act and *characterized* his *manner* as *bordering* on police brutality. Use of the words "manner," "as if," and "bordered"—and indeed the entire letter—do not describe or imply an accusation of physical conduct and clearly let the reader know that the characterizations were not meant to be precise.

We recognize, of course, that statements of opinion are actionable when they "imply a false assertion of fact." *Milkovich,* 497 U.S. at 18–19, 110 S.Ct. at 2706. If Devlin's statement could reasonably be interpreted as accusing Turner of physically abusing the victim, we would have a different case. Contrary to the suggestion in Justice Martone's concurring opinion, however, we do not believe a reasonable person could make that implication from Devlin's letter. Devlin does not complain about Turner's physical conduct but rather his demeanor—his demand, his rudeness, his manner. The reasonable inferences to be drawn must be determined by reading the letter as a whole, not by singling out two words. We agree with the concurrence that an allegation of police brutality might,

in some cases, be read as an allegation of physical abuse, but we do not believe it can reasonably be read that way in this case. *See Falwell,* 485 U.S. at 50, 108 S.Ct. at 879; *Letter Carriers,* 418 U.S. at 284–86, 94 S.Ct. at 2781–82; *Bresler,* 398 U.S. at 14, 90 S.Ct. at 1542; *cf. Baltimore City Police v. Andrew,* 318 Md. 3, 566 A.2d 755, 757 (1989) (charge that officer placed suspect in a headlock and threw him against a vehicle was consistent with the general understanding of police brutality).

In *Yetman,* the defendant referred to the plaintiff as a communist while addressing an audience of the plaintiff's political opponents. 168 Ariz. at 73, 811 P.2d at 325. Rejecting the argument that the comment could be interpreted only as an assertion of fact on the one hand or only as invective or hyperbole on the other, we closely scrutinized the record and found, in context, that it reasonably could be interpreted either way. *Id.* at 79–80, 811 P.2d at 331–32.[9]

In this case, the context of Devlin's statements dictates the opposite conclusion—the statements were nothing more than an assessment of, and attack on, Turner's manner, demeanor, methods, and interviewing techniques. Unlike *Yetman,* therefore, where the evidence supported two tenable views, this record shows that Devlin's analogy was unmistakably exaggeration used to voice ardent protest against methods— not an assertion of fact. In our view, "even the most careless reader" would have perceived Devlin's description as "no more than rhetorical hyperbole, a vigorous epithet" used to criticize Turner's behavior. *Bresler,* 398 U.S. at 14, 90 S.Ct. at 1542; *see also Thuma v. Hearst Corp.,* 340 F.Supp. 867, 869, 871–72 (D.Md.1972) (reference to police shooting as "cold-blooded murder" was hyperbole used to voice disapproval for what the speaker believed to be an unjustified shooting); *Fleming,* 454

---

**9.** Because the comment was made at a political gathering, we held that it "could easily be interpreted as nothing more than rhetorical political invective or hyperbole." *Yetman,* 168 Ariz. at 79, 811 P.2d at 331. The record *also* supported a *factual* interpretation. Specifically, the record revealed that: (1) the defendant intended

his comment to be factual; (2) a newspaper reporter interpreted the statement as an assertion of fact; and (3) there was expert testimony that the statement was susceptible to the interpretation that Yetman was actually a communist. *Id.* at 80 & nn. 5, 6, 811 P.2d at 332 & nn. 5, 6.

N.E.2d at 101 (reference to the police as "dictators and Nazis" was non-actionable rhetoric used to criticize behavior, not a statement of fact); *Orr v. Lynch,* 60 A.D.2d 949, 401 N.Y.S.2d 897, 899 (App. Div.) (report that police "opened fire" and "gunned down" suspect was non-actionable rhetorical hyperbole), *aff'd,* 45 N.Y.2d 903, 411 N.Y.S.2d 10, 383 N.E.2d 562 (1978).

This, of course, distinguishes the present case from *Yetman,* where we left it to the jury to decide whether the statement contained a provably false factual assertion or whether it was mere opinion, implying no assertion of provable fact and therefore not actionable. *Id.* at 80–81, 811 P.2d at 332–33. In this case, we do not believe there is an issue of interpretation for the jury. While this view of the facts may be arguable, *see Yetman,* 168 Ariz. at 83, 811 P.2d at 335 (Corcoran, J., dissenting), this case and *Yetman* are not *legally* inconsistent. Contrary to the suggestion in Justice Martone's concurrence, *Yetman* is not overruled explicitly, nor *sub silentio,* and has not been "interred."

We believe, therefore, that summary judgment was properly granted in favor of Devlin, both because her comments state matters that are not susceptible to proof of truth or falsity and because they state matters that cannot reasonably be interpreted as actual facts. Given this, we need not decide whether the comments were made with actual malice as required by *New York Times.*

## CONCLUSION

The First Amendment protects Devlin's criticism of Turner's handling of the investigation. The letter relates to a matter of great public concern. The statements are subjective impressions, unprovable as false. Also, the letter states matters that cannot reasonably be understood as stating actual facts about Turner. We do not address whether Turner's behavior deserved such sharp criticism. We hold only that the speech at issue cannot be the subject of a defamation action. Because the trial judge properly granted Devlin's motion for summary judgment and denied Turner's, the

court of appeals' decision is vacated and the trial court's judgment is affirmed.

## APPENDIX

### TO WHOM IT MAY CONCERN:

On April 14, 1988, at Desert Sky Junior High School, the day began with a student who had been severely assaulted by his stepfather, a reputed drug offender and mental health patient. The student asked for medical and social assistance and was immediately referred to the nurse's office by the counseling office. As is required by ARS 13–3260, Child Protective Services (CPS) was called and the report made. Because of the severity of the physical evidence and the request of the student to report the event, CPS advised that the police department be contacted without delay so that pictures could be taken and a physical examination by a physician, which was deemed necessary, could be accomplished while they began procedures to assign a case worker.

When the Phoenix police officer arrived, rather than visiting the student at his bedside where he was being monitored for symptoms of concussion, possible damage to the internal left ear and left eye; the officer demanded that the student stand against the wall. The student was interrogated as if he, the victim, had committed an illegal act. The officer was rude and disrespectful, and his manner bordered on police brutality.

I am submitting this letter of complaint not only against officer Tom Turner, Badge # 1185, but as a protest against the manner in which the Phoenix Police Department is trained to deal with this problem specifically, and with citizens of this community in general.

Because of our geographical location, we work equally with the Phoenix and the Glendale systems. It is impossible to work with both organizations and not compare the services rendered by each group. The well-trained, courteous manner of the Glendale force is to be commended as a true service to their community. It is obvious that they have been instructed to proceed

in a manner which will not further destroy the dignity of the already mistreated individual whom they have been requested to assist. They are truly a respected service organization to Glendale and to the State of Arizona. The behavior of officer Turner is not an isolated case, but rather the routine procedure to be expected of the Phoenix Police Department.

There is no excuse for this outdated, uneducated behavior on the part of so important a group as our Police Department. These men have a right to the most current and effective education available today. This education, long overdue, is not a luxury but a necessity. We should pursue this matter until we are assured that every citizen in the City of Phoenix, regardless of race, religion or *AGE* can expect to be treated with the common courtesy and respect due them.

Respectfully,

Barbara Devlin, R.N.

MOELLER, V.C.J., and ZLAKET, J., concur.

CORCORAN, Justice, specially concurring:

I agree with the opinion of the court, except its reaffirmation of *Yetman* decided in a 3–2 opinion. The *result* in *Yetman* should have been the same as we reach here. *See Yetman v. English,* 168 Ariz. 71, 82–83, 811 P.2d 323, 334–35, Cameron, J., dissenting in part, 168 Ariz. at 82–83, 811 P.2d at 334–35, and Corcoran, J., dissenting, 168 Ariz. at 83, 811 P.2d at 335 (1991); and *Yetman v. English,* 163 Ariz. 73, 76, 786 P.2d 403, 406, Livermore, J., dissenting (App.1989).

MARTONE, Justice, concurring in the judgment and in the opinion in part.

I agree with today's decision, but believe we must reject *Yetman v. English,* 168

Ariz. 71, 811 P.2d 323 (1991), to reach it. I do not believe that the court's attempt to distinguish *Yetman* is persuasive. Thus, whether the court admits it or not, *Yetman* does not survive today's decision.

As the court acknowledges, *ante* at 203, 848 P.2d at 288, the court of appeals relied on *Yetman* in concluding that Turner's claim was "provably false." Bound by *Yetman,* it could have reached no other conclusion. We are not so constrained.

In *Yetman,* two members of this court thought that the words "[w]hat kind of communist do we have up there that thinks it's improper to protect your interests?" could reasonably be interpreted as stating actual facts, and were provably false. *Id.* at 80–81, 811 P.2d at 332–33.

In my view, *Yetman* ignored the letter and the spirit of *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1 (1990). As this court notes, *ante* at 207, 848 P.2d at 292, *Milkovich* expressly used as a nonactionable example, the words "[i]n my opinion, Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin." 497 U.S. at 20, 110 S.Ct. at 2706. The *Milkovich* example and the *Yetman* language are indistinguishable. To call someone a communist, in contrast to stating as a fact that one is a member of the communist party, is neither a statement of fact nor provably false.[1]

Contrast calling someone a communist under *Yetman* with the words in issue here, that the police officer's "manner bordered on police brutality." A manner which borders on police brutality is far more likely to be understood as a statement of fact than a characterization of someone as a communist. Bordering on police brutality conjures up an image of physical abuse. Physical abuse is factual, not abstract. Calling someone a commu-

---

**1.** At common law, calling someone a communist was not always even defamatory. Whether such an assertion was defamatory depended upon the prevailing political climate. *McAndrew v. Scranton Republican Pub. Co.,* 364 Pa. 504, 72 A.2d 780, 784 (1950) (not defamatory), *Levy v. Gelber,* 175 Misc. 746, 25 N.Y.S.2d 148, 149 (Sup.Ct.1941) (defamatory), *Garriga v. Rich-* *field,* 174 Misc. 315, 20 N.Y.S.2d 544, 549 (Sup. Ct.1940) (not defamatory). *See generally Grant v. Reader's Digest Ass'n,* 151 F.2d 733 (2d Cir. 1945), *cert. denied,* 326 U.S. 797, 66 S.Ct. 492, 90 L.Ed. 485 (1945) *and Torts—Label of "Communist Dominated" Held Libelous Per Se,* 1953 Wash.U.L.Q. 331.

nist in the context of *Yetman* is not likely to be understood as factual. It is likely to be understood as ideological rhetoric. And if that were not enough, how can it be said that being a communist is provably false? What litmus test does one use to test the label? Marx? Engels? Lenin? Gorbachev? Sartre? Kazantzakis?

In contrast, one could more easily prove as false that one's manners bordered on police brutality by calling witnesses to testify about those manners and to show that there was no physical abuse involved. Which is easier to prove?

For these reasons, I do not see how we can reach today's conclusion without overruling *Yetman*. If *Yetman* is to survive, today's decision cannot stand. Because I agree with the court that the words here are not actionable, I am of the view that *Yetman* has been interred *sub silentio*.